[L. A. No. 15471.   In Bank.—February 29, 1936.]

AGRICULTURAL PRORATE COMMISSION OF THE STATE OF CALIFORNIA et al., Petitioners, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY et al., Respondents.

· U. S. Webb, Attorney-General, Alberta Belford and Walter L. Bowers, Deputies Attorney-General, and Edson Abel for Petitioners.

Mathew O. Tobriner and A. M. Cathcart, as *Amici Curiae* on Behalf of Petitioners.

Jennings & Belcher, Bruce McDaniel, R. P. Jennings and Louis E. Kearney for Respondents.

Stewart, Shaw & Murphy, Arvin B. Shaw, Jr., Athearn, Chandler & Farmer, Bauer, MacDonald, Schultheis & Pettit, Brobeck, Phleger & Harrison, J. C. Flannery, Gavin McNab, Schmulowitz, Wyman, Aikins & Brune, Jesse H. Steinhart and John J. Goldberg, as *Amici Curiae* on Behalf of Respondents.

CURTIS, J.—The 1933 session of the legislature of this state enacted a statute creating the Agricultural Prorate Commission. (Stats. 1933, p. 1969.) This act is frequently referred to in the briefs of counsel as the Prorate Act, and for the sake of brevity, we shall refer to it by that name or designation. In section 1 of the act is set forth the declaration of the legislature, which may properly be deemed as a statement of the reason and purpose of the legislature in the enactment of this statute. This section is as follows: "The unreasonable waste of agricultural wealth occasioned by the harvesting, preparation for market and delivery to market of greater quantities of agricultural commodities than are reasonably necessary to supply the demands of the market is opposed to the public interest and the difficulty inherent in any attempt by individuals to correlate within a reasonable degree the supply of any agricultural commodity to current consumptive demands is creating chaotic economic conditions in certain agricultural areas of the state of such severity as to imperil the ability of agricultural producers to contribute in appropriate amounts to the support of ordinary governmental and educational functions, thus tending to increase and increasing the tax burdens of other citizens for the same purposes. In the interest of the public welfare and general prosperity of the state, the unnecessary and unreasonable waste of agricultural wealth, hereinafter referred to as 'agricultural waste', involved in the harvesting and/or preparation for and delivery to market of agricultural commodities for which there exists only a limited consumer demand should be eliminated while at the same time preserving to all agricultural producers an equality of opportunity in the available markets."

Succeeding sections of the act provide for the creation of an agricultural prorate commission consisting of nine members to be appointed by the Governor with the approval of the senate. This commission is given power to hold hearings and

to subpoena witnesses. Each member is empowered to administer oaths in any proceeding before the commission. A full and accurate record of the business transactions of the commission is to be kept and placed on file in the office of the commission. Section 8 of the act provides for the presentation to the commission of a petition for the institution of a program of prorated marketing with respect to any variety or kind of agricultural commodity "which shall be signed by not less than fifty producers of said variety or kind of agricultural commodity within the proposed prorating zone provided, that if it be alleged in said petition that it is signed by two-thirds or more in number of the producers within the proposed zone of the commodity as to which it is proposed to institute a prorating program and by the owners of two-thirds or more in number of the producing factors of said commodity in said proposed zone, the number of signers shall be immaterial".

Sections 9, 10 and 11 are as follows:

"Sec. 9. Upon the presentation of any such petition, the Commission shall hold a hearing at some central point located within the district described in said petition and proposed to be established as a proration zone. Notice of such hearing shall be given at least ten (10) days prior thereto by publication in a newspaper of general circulation printed and published in the district affected and by posting in at least three (3) conspicuous places in said district. In case the proposed proration zone includes more than one district the required notice shall be given in each district and the Commission shall hold hearings in each of said districts. At said hearings, the Commission shall receive and hear the evidence offered by the petitioners in support of the petition and by any interested person in opposition thereto. Said hearings may be adjourned from time to time and from place to place as the circumstances may require. A transcript of the proceedings at all such hearings shall be made by the Commission and shall be opened to inspection by any interested party.

"Sec. 10. If upon such hearing it shall be made to appear to the Commission:

"(1) That the petition is signed in person or by proxy by the required number of producers and by the owners of the required number of producing factors; and

"(2) That the economic stability of the agricultural industry concerned is being or is about to be imperiled by prevailing market conditions; and

"(3) That agricultural waste is occurring or is about to occur; and

"(4) That the institution of a program of prorated marketing will conserve the agricultural wealth of the State and will prevent threatened economic waste; and

"(5) That the institution of a proration program as proposed in the petition will advance the public welfare without injustice to any producer; and

"(6) That the proposed program may be instituted and conducted without permitting unreasonable profits to the producers and that the commodity named in the petition cannot be marketed at a reasonable profit otherwise than by means of such a program; and

"(7) That the proposed zone of proration includes all of the producing territory within this State reasonably necessary to render the proposed program feasible, it shall make written findings to that effect. If in any case of any petition it shall appear to the Commission that the inclusion of territory additional to that described in the petition is necessary to the feasibility of the proposed program, it shall postpone further proceedings until notice shall have been given to the producers within such additional territory in the manner provided for in section 8 hereof. Thereafter the Commission may complete said hearings and make findings in the manner hereinbefore provided. If the Commission shall find against the existence of any of the facts required to be present under this section, it shall deny the petition.

"Sec. 11. If it shall be alleged in said petition that it is signed by two-thirds or more of the producers of the commodity named in the petition within the zone described and by the owners of two-thirds or more of the producing factors in said zone, proof shall be required in support of such allegation and the Commission shall make a finding with respect thereto. If it shall find such allegation to be the fact, and shall also find to exist all of the other facts specified in section 10 of this act, the Commission shall forthwith make an order declaring the proposed program adopted

and specifying the zone in which the program shall be effective."

Sections 21, 22 and 23 provide respectively for certain fees to be collected on issuing certificates to producers sufficient to meet the expense of administering the program; for the making of rules and regulations by the commission; and for the termination of any proration program by petition filed with the commission. Section 24 provides for injunction proceedings to be instituted by the commission against any person who shall market any commodity in violation of any provision of the proration program, and section 25 makes any such person civilly liable in the sum of five hundred dollars for each and every violation to be recovered by the commission in any court of competent jurisdiction. Any amount so recovered is to be paid into the "Agricultural Prorate Commission fund". The act further provides that any person violating any of its provisions shall be guilty of a misdemeanor.

In March, 1935, a petition was filed with the Agricultural Prorate Commission, signed by W. W. Wilson and others, in which the signers thereof asked for the institution of a program of prorated marketing with respect to lemons grown in the state of California. This petition set forth the necessary facts required of petitions of that character by said Prorate Act. Among other facts stated in said petition, it is alleged therein: "That the producing factor for the purpose of proceeding is hereby specified as a standard packed box of lemons based on the crop from November 1, 1933, to October 31, 1934," and that said "petition is signed by two-thirds or more in number of the producers of lemons in the state of California, . . . and by the owners of two-thirds or more of the producing factors of said commodity in said zone". The following facts showing the necessity for the institution of a prorating program for lemons in said proposed zone are set forth in said petition: "The marketing of California lemons without any control is subject to gluts and famines in available supplies which detrimentally affect price levels and which have in the past resulted in producers receiving less than their costs of production. The situation has been substantially improved in recent years by means of a voluntary proration program affecting only a portion of

the crop but it is now felt that the burden of this surplus control should be spread over all producers.

"The general plan of proration which petitioners suggest for adoption in the proposed proration zone calls for a *pro rata* curtailment of the marketing privileges of each producer on a basis of available supplies during specified proration periods.

"That unless some form of control of marketing is imposed which permits the relating of the supply of lemons to existing demand, severe agricultural and economic waste will occur in that the resources of the producers will be wasted in preparing for market lemons in excess of the reasonable demand therefor; that the economic stability of the lemon industry is about to be imperiled by prevailing market conditions; that a program of prorated marketing pursuant to said Act will prevent such waste and will conserve the agricultural wealth of the State of California and will prevent threatened economic waste."

After due notice a hearing was had on said petition at which witnesses were examined and other evidence received. At its conclusion the commission rendered its decision in which it found substantially that all the allegations of said petition were true. It accordingly entered its order that said petition be granted and that a prorated marketing zone or district with respect to lemons produced within a prorated zone comprised of the state of California be instituted and formed. After proceedings duly had the Agricultural Prorate Commission approved a program for the prorating of lemons grown within the state which had been prepared and proposed by the prorate committee, and appointed Walter Shippey as zone agent for the purpose of administering said program as required by section 18 of the act. The commission through said zone agent was proceeding to enforce said program over the objections of a number of shippers and growers of lemons who thereafter and on or about the 8th day of May, 1935, instituted an action in the Superior Court of the County of Los Angeles against said commission, the members of said prorate committee, and said zone agent, to enjoin and restrain them from enforcing or attempting to enforce as against the plaintiffs in said action or any of them, any of the terms of the orders of said commission and of said

program with respect to the proration of lemons within said prorate zone or district. In said action a hearing was had upon the application of plaintiffs therein for a temporary injunction against the defendants therein. As a result of said hearing, said superior court filed a written opinion in which it expressed its intention of granting said application for a temporary injunction as prayed for. Thereafter the applicants herein, consisting of said Agricultural Prorate Commission, the members of the prorate committee, and its zone agent, being the defendants in said injunction action, instituted this proceeding before the District Court of Appeal of the Second District, Division One thereof, asking that a writ of prohibition issue directed to the respondent court and the judge thereof, commanding them to desist from any further proceedings in connection with any restraining order or preliminary injunction in the action brought against said applicants by said shippers and lemon growers except to dissolve said restraining order or preliminary injunction. The District Court of Appeal denied said petition; whereupon this court, after a petition for a hearing of said action, ordered said proceeding transferred to this court, and issued an alternative writ of prohibition directed to respondents as prayed for in the petition filed in said District Court of Appeal, and to show cause why they should not be absolutely restrained from any further proceeding in said suit for an injunction. The respondents have appeared herein both by general demurrer and answer. No claim is made that the answer raises any material issue of fact. The applicants herein base their right to the relief prayed for in their petition upon the ground that in the enforcement of said prorate program they were proceeding under the terms and provisions of the Prorate Act, and that the respondent court is without jurisdiction to issue an injunction to prevent the execution of a public statute by officers of the law appointed or selected for that purpose. It is apparent, therefore, that the major question calling for decision in this proceeding is the constitutionality of the Agricultural Prorate Act.

As the attack upon the statute is made by respondents, it seems that the most logical manner in which to treat the question is to discuss in their order the several objections raised by the respondents as to the validity of said act.

Respondents in their briefs set forth the following grounds on which they claim that the act is violative of the federal and state Constitutions.

1. It is violative of the commerce clause of the federal Constitution.

2. It unlawfully attempts to delegate legislative powers in violation of article III, section 1, and article IV, section 1, of the Constitution of the state of California.

3. It unlawfully attempts to delegate judicial powers in violation of article VI of the Constitution of the state of California.

4. It is in violation of the fifth and fourteenth amendments of the federal Constitution and of article I, sections 1, 13 and 14 of the Constitution of the state of California.

First. The record in this case shows that practically all of the lemon acreage and lemon production of the United States is located in the state of California and that approximately 99 per cent of all lemons produced in California which are shipped in fresh fruit channels move in interstate commerce and are used and consumed outside of the state of California; that before shipment either in intrastate or interstate commerce, the lemons, after being picked from the trees, are delivered to various packing houses located in the lemon growing sections of the state, where they are sorted, wrapped and packed in boxes preparatory for shipment. They are then ready to enter the channels of trade either intrastate or interstate. The bulk of all lemons sold outside of the state of California are sold in carload lots through auction houses located out of the state, and to a large extent in the large cities of this country; that of the total average annual production of lemons in the state approximately only about 16 per cent are disposed of through by-product channels or similar uses, and that the returns from lemons delivered to by-product and similar plants as a rule are less than the cost of producing lemons delivered for such uses.

Under the Prorate Act after the prorate program has been formulated and approved by the commission, the agent appointed to administer the program shall issue certificates as provided in said act. These certificates are divided into primary and secondary certificates. Each producer shall be entitled to one primary certificate, which shall indicate to

him the amount of the commodity, in the present instance the amount of lemons, which said producer shall be entitled to harvest or otherwise prepare for market. The primary certificate shall also indicate from time to time the number of secondary certificates issued under it. Secondary certificates shall be numbered consecutively and shall be used to control the time and volume of harvesting the crop which the producer, as indicated by the primary certificate issued to him, is entitled to produce. Said secondary certificates shall accompany all deliveries of the prorated commodity into a primary trade channel, and it shall be unlawful for any prorated commodity to be harvested and prepared for marketing unless there shall have been an appropriate secondary certificate issued therefor. It will thus be seen that the regulations prescribed by the act apply only to the harvesting and preparation of the prorated commodity and not to the sale or future disposition thereof.

The question as to just when an article or commodity intended for interstate commerce actually ceases to be subject to the laws of the state in which it is produced, and passes under the jurisdiction of the federal government where it is governed by the commerce clause of the Constitution of the United States, has been the subject of extensive consideration both by the federal and state courts. A number of cases which have given consideration to this question have arisen in taxation proceedings where the state has attempted to levy a tax upon a commodity which was prepared for shipment beyond the confines of the state. The leading case on this subject is *Coe* v. *Errol*, 116 U. S. 517 [6 Sup. Ct. 475, 29 L. Ed. 715]. In that case logs had been cut in the state of New Hampshire and hauled to a river bank within the village of Errol in said state with the purpose and intent of putting the logs in the river and floating them down to the state of Maine whenever the water got sufficiently high. While the logs were on the bank awaiting a time when they could be floated down the river and out of the state, the village of Errol levied a tax upon them which was contested by the owner of the logs. He contended that as the logs had been intended and prepared for shipment beyond the state, the tax was an unconstitutional burden on interstate commerce. The case finally reached the Supreme Court of the United

States which court upheld the tax upon the ground that the logs at the time of the levy, although prepared for interstate commerce, and awaiting an opportunity for transportation out of the state, were not the subject of interstate commerce, and would not be until they had actually begun their movement from the state in which they were produced into another state. We quote briefly from the opinion in that case as follows:

"This question does not present the predicament of goods in course of transportation through a state, though detained for a time within the state by low water or other causes of delay, as was the case of the logs cut in the state of Maine, the tax on which was abated by the Supreme Court of New Hampshire. Such goods are already in the course of commercial transportation, and are clearly within the protection of the Constitution. And so, we think, would the goods in question be when actually started in the course of transportation to another state, or delivered to a carrier for such transportation. There must be a point of time when they cease to be governed exclusively by the domestic law and begin to be governed and protected by the national law of commercial regulation, and that moment seems to us to be a legitimate one for this purpose, in which they commence their final movement for transportation from the state of their origin to that of their destination. When the products of the farm or the forest are collected and brought in from the surrounding country to a town or station serving as an entrepot for that particular region, whether on a river or a line of railroad, such products are not yet exports, nor are they in process of exportation, nor is exportation begun until they are committed to the common carrier for transportation out of the state to the state of their destination, or have started on their ultimate passage to that state. Until then it is reasonable to regard them as not only within the state of their origin, but as a part of the general mass of property of that state, subject to its jurisdiction, and liable to taxation there, if not taxed by reason of their being intended for exportation, but taxed without any discrimination, in the usual way and manner in which such property is taxed in the state."

That case was followed by the case of *Heisler* v. *Thomas Colliery Co.*, 260 U. S. 245 [43 Sup. Ct. 83, 67 L. Ed. 237]. In that case the state of Pennsylvania, which virtually had

a monopoly on the production of anthracite coal, 80 per cent of which was consumed in other states, levied a severance tax upon such coal at the mouth of the pit. In upholding this tax the court, at page 259, said:

"The reach and consequences of the contention repel its acceptance. If the possibility, or, indeed, certainty of exportation of a product or article from a State determines it to be in interstate commerce before the commencement of its movement from the State, it would seem to follow that it is in such commerce from the instant of its growth or production, and in the case of coals, as they lie in the ground. The result would be curious. It would nationalize all industries, it would nationalize and withdraw from state jurisdiction and deliver to federal commercial control the fruits of California and the South, the wheat of the West and its meats, the cotton of the South, the shoes of Massachusetts and the woolen industries of other States, at the very inception of their production or growth, that is, the fruits unpicked, the cotton and wheat ungathered, hides and flesh of cattle yet 'on the hoof,' wool yet unshorn, and coal yet unmined, because they are in varying percentages destined for and surely to be exported to States other than those of their production."

A similar holding was had in the case *Utah Power & Light Co.* v. *Pfost*, 286 U. S. 165 [52 Sup. Ct. 548, 76 L. Ed. 1038]. In that case the power company owned and operated a plant for the generation of electricity, situated in the state of Idaho, and a transmission line extending from the plant into the state of Utah over which electric current was transmitted from its plant into the state of Utah. The state of Idaho levied a tax upon the electricity generated at the plant. The validity of the statute levying such a tax was attacked by the power company. This was an extreme case and it would seem that it might be plausibly argued that the electricity immediately upon its generation entered into interstate commerce and was not therefore subject to taxation by the state of Idaho. The court ruled otherwise and in an extended opinion upheld the statute. We will only set forth herein a brief extract therefrom.

"We are satisfied, upon a consideration of the whole case, that the process of generation is as essentially local as though electrical energy were a physical thing; and to that situation

we must apply, as controlling, the general rule that commerce does not begin until manufacture is finished, and hence the commerce clause of the Constitution does not prevent the state from exercising exclusive control over the manufacture."

A more recent case was that of *Chassaniol v. Greenwood*, 291 U. S. 584 [54 Sup. Ct. 541, 78 L. Ed. 1004]. This case arose in the state of Mississippi and involved a tax levied by the city of Greenwood, "upon every person engaged in the business of buying or selling cotton for himself" within the city. It is a well-known fact that the bulk of cotton raised in Mississippi and other Southern states enters interstate commerce. Greenwood was a concentration point for a certain grade of cotton and an active market for its purchase and sale. Chassaniol was one of numerous cotton buyers who dealt in that market. All cotton purchased by him was shipped out of the state. He resisted the tax as a burden on interstate commerce. His contention was found to be without merit by the court, as will appear from the following excerpt from its opinion:

"Ginning cotton, transporting it to Greenwood, and warehousing, buying and compressing it there, are each, like the growing of it, steps in preparation for the sale and shipment in interstate or foreign commerce. But each step prior to the sale and shipment is a transaction local to Mississippi, a transaction in intrastate commerce. Hence those engaged in performing any such local function may be subjected to an occupation tax, just as the property used, or procured, by them may be subjected to a property tax."

While these authorities all involved the question of taxation, they clearly and definitely establish the point of time at which a commodity enters into interstate commerce and ceases to be subject to the state wherein it is produced, and that point of time is when the commodity actually commences its journey from one state to another, and they further hold that until that time arrives the state in which the commodity is located has jurisdiction over it, and whatever action the state takes in reference to said commodity cannot be held to be violative of the interstate commerce clause of the United States Constitution.

A case more in point than those just cited and one which seems decisive of the question now under discussion is the case

of *Champlin Refining Co.* v. *Corporation Commission,* 51 Fed. (2d) 823; Id., 286 U. S. 210 [52 Sup. Ct. 559, 76 L. Ed. 1062, 86 A. L. R. 403]. That case involved the validity of a prorating statute of the state of Oklahoma, known as the "Curtailment Act". Its provisions are strikingly similar to the Agricultural Prorate Act of this state. It sought to stop waste in the production of crude oil and petroleum. Our statute seeks to stop waste in the production of lemons in this state and to preserve the lemon industry. Both the lemons of California and the crude oil and petroleum of Oklahoma enter into interstate commerce in maximum proportions. Yet the statute of Oklahoma was sustained both by the United States District Court and the United States Supreme Court. In its opinion the latter court upholds the legislation in the following brief but comprehensive statement (p. 235) :

"Plaintiff contends that the Act and proration orders operate to burden interstate commerce in crude oil and its products in violation of the commerce clause. It is clear that the regulations prescribed and authorized by the Act and the proration established by the commission apply only to production and not to sales or transportation of crude oil or its products. Such production is essentially a mining operation and therefore is not a part of interstate commerce even though the product obtained is intended to be and in fact is immediately shipped in such commerce. *Oliver Iron Min. Co.* v. *Lord,* 262 U. S. 172, 178 [43 Sup. Ct. 526, 67 L. Ed. 929] ; *Hope Natural Gas Co.* v. *Hall,* 274 U. S. 284, 288 [47 Sup. Ct. 639, 71 L. Ed. 1049] ; *Foster-Fountain Packing Co.* v. *Haydel,* 278 U. S. 1, 10 [49 Sup. Ct. 1, 73 L. Ed. 147] ; *Utah Power & Light Co.* v. *Pfost, supra.* No violation of the commerce clause is shown."

The United States District Court in an opinion in which two members of the Circuit Court of Appeals participated was equally emphatic in its views as to the validity of the statute and that it did not conflict with the power of Congress over interstate commerce. These views were expressed as follows (p. 829) :

"We are clearly of the opinion that the scheme of proration is not invalid as a regulation of or burden on interstate commerce. It is true that a substantial portion of the oil produced in this state goes into the channel of such com-

merce. But in order to conflict with the regulatory power of Congress, there must be a direct burden thereon. In this case, the interference is entirely too remote in character. The principle is too well settled to require citation, that the congressional power of regulation attaches only when interstate transportation has begun. . . . The production of oil is analogous to the manufacture of goods or the mining of coal. Neither is interstate commerce, although the product may be later shipped to other states.'' (Citing cases.)

It is difficult to conceive of a case more precisely in point with the instant case than the case last referred to. Its statement of the law upon the question involved is so completely convincing that we deem further comment unnecessary.

Respondents have presented a most formidable list of authorities which they contend support their contention that the Prorate Act contravenes the commerce clause of the United States Constitution. The length of this opinion will not permit a reference to all of these authorities. We shall only comment upon three of the cases cited by respondents, as admittedly they are the strongest cases presented in respondents' favor. They are *Lemke* v. *Farmers Grain Co. of Embden, North Dakota,* 258 U. S. 50 [42 Sup. Ct. 244, 66 L. Ed. 458], *Shafer* v. *Farmers Grain Co. of Embden,* 268 U. S. 189 [45 Sup. Ct. 481, 69 L. Ed. 909], and *Baldwin, as Commissioner of Agriculture and Markets of the State of New York,* v. *G. A. F. Seelig, Inc.,* 294 U. S. 511 [55 Sup. Ct. 497, 79 L. Ed. 1032].

The first two of these decisions involved statutes enacted by the state of North Dakota. A brief excerpt from the opinion in the Lemke case, *supra,* will demonstrate so radical a difference between that case and the case before us as to render the former of but little assistance in the decision of the question now under discussion. We refer to that portion of the opinion commencing on page 56 and reading as follows: ''This act shows a comprehensive scheme to regulate the buying of grain. Such purchases can only be made by those who hold licenses from the state, pay state charges for the same, and act under a system of grading, inspecting and weighing fully defined in the act. Furthermore, the grain can only be purchased subject to the power of the state

grain inspector to determine the margin of profit which the buyer shall realize upon this purchase. This authority is conferred in § 23 and the margin of profit is defined to be the difference between the price paid at the North Dakota elevator and the market price, with an allowance for freight, at the Minnesota points to which the grain is shipped and sold. That is, the state officer may fix and determine the price to be paid for grain which is bought, shipped, and sold in interstate commerce. That this is a regulation of interstate commerce, is obvious from its mere statement.

"Nor will it do to say that the state law acts before the interstate transaction begins. It seizes upon the grain and controls its purchase at the beginning of interstate commerce."

The case of *Shafer* v. *Farmers Grain Co. of Embden, supra,* also involved a statute passed by the legislature of North Dakota relative to the sale and shipment of grain grown within the state. This statute, while not as drastic as the statute held to be unconstitutional in the Lemke case, *supra,* contained many of the features of the earlier statute as appears from a statement in the opinion in the Shafer case reading as follows: "A prior statute concededly 'having the same general purpose' was adopted by the state legislature in 1919 and held invalid by this Court in *Lemke* v. *Farmers Grain Co.,* 258 U. S. 50 [42 Sup. Ct. 244, 66 L. Ed. 458], as an interference with interstate commerce."

Each of the statutes attempted to impose regulations upon the buying of wheat and upon its disposition after it had passed into the hands of the purchaser. This is made clear from the following statement in the Shafer case (p. 200):

"The Act prevents buying by grade, unless the buyer secures from the State a grading license for himself or his agent. The general practice is to buy and ship without separating the dockage from the wheat, the price paid carrying a right to both. The Act requires the buyer to separate the dockage and return it to the producer, unless it be distinctly valued and paid for." This and other passages from the opinion show conclusively that the statute not only regulated the buying of wheat which was intended for interstate commerce, but it went further and required the buyer after the wheat had been bought and had entered interstate commerce to grade the same and return the dockage to the producer

unless other arrangements had been made between the buyer and producer. For these reasons the court held that "the Act directly interferes with and burdens interstate commerce, and is an attempt by the State to prescribe rules under which an important part of such commerce shall be conducted." (p. 201.) There is nothing in these decisions in conflict with the authorities hereto cited which holds that the state has the right to impose regulations upon any commodity produced in the state before such commodity has entered interstate commerce, "even though the product obtained is intended to be and in fact is immediately shipped in such commerce." (*Champlin Refining Co.* v. *Corporation Commission of Oklahoma,* 286 U. S. 210, 235 [52 Sup. Ct. 559, 76 L. Ed. 1062, 86 A. L. R. 403].) Or, as was stated in the same case by the United States District Court, "The principle is too well settled to require citation, that the congressional power of regulation attaches only when interstate transportation has begun." (51 Fed. (2d) 823, 829.)

In *Baldwin, as Commissioner of Agriculture and Markets of the State of New York* v. *G. A. F. Seelig, Inc., supra,* the court had under consideration a statute of the state of New York which prohibited the sale of milk imported from another state unless the price paid in that other state to the producer was up to the minimum price prescribed by the state of New York for purchases from local producers. The court held that such a regulation was a direct interference with interstate commerce as it virtually erected a barrier around the state which prevented shipments of milk into the state unless its sale price met the requirements of the state statute. There is no similarity between the statute of New York which attempted to fix the price of milk shipped into it from another state and the California statute, which simply limits the amount of prorated commodity which can be produced and prepared for marketing, and after the commodity is produced, harvested and prepared for market leaves the owner free to sell or otherwise dispose of his product to whomsoever may choose to purchase it, and at such price as the purchaser may pay, with perfect liberty to the purchaser to sell or dispose of the purchased article within or without the state as best suits his interest. There is nothing in the three cases relied upon by respondents and which we have discussed above,

and which are admittedly the strongest cases in respondents' favor, to overcome those authorities cited in the previous pages of this opinion upon which the applicants rely. The other authorities cited by respondents are of slight aid to the solution of the question before us, and a detailed analysis of them would not add anything to this discussion. We are satisfied from the authorities upon the subject that the Prorate Act contains nothing that infringes upon the exclusive right of the federal government to regulate interstate commerce. It cannot be held unconstitutional upon that ground.

■ Second. It is next contended that the act is unconstitutional in that it unlawfully attempts to delegate legislative powers in violation of article III, section 1, and of article IV, section 1, of the Constitution of this state.

The act creates an Agricultural Prorate Commission with the powers and duties set forth in the act and briefly stated in the beginning of this opinion. It further provides for the appointment by the commission of a prorate committee and prescribes the duties of such committee. It is the contention of the respondent that the imposition of these duties upon the committee is an unlawful delegation of legislative powers. No claim is made that the constitutional provisions are violated by any of the terms of the act prescribing the powers and duties conferred upon the commission. The claimed violation of the constitutional prohibition against the delegation of legislative powers is confined to those provisions of the act defining the powers of the prorate committee. The particular sections of the act which respondents contend contain the provisions claimed by them to be unconstitutional are sections 18, 20, 21, 22 and 24. These sections briefly stated prescribe, after the appointment of the program committee, the duties of such committee, which include the duty to determine the method, manner and extent of prorating under the authority of the prorate commission.

The specific defect ascribed by respondents to the act is that there is no standard whatever laid down by the legislature to guide the program committee except the exceedingly general declaration of policy contained in section 1 of the act. This criticism of the act is hardly justified. The program after its preparation by the committee must be submitted to the prorate commission for its approval before it becomes effective for any purpose, and the commission be-

fore approving the same "must find that the same is reasonably calculated to maintain the existence of the facts specified in section 10 hereof." Section 10 of the act sets forth seven essential facts which must be made to appear before any prorate district or zone is organized. These seven basic facts are the very foundation of every proceeding for the formation of a prorate district, and every one of them must be found by the commission to exist, or the petition must be denied. As the program must conform to these legislative requirements, we think it cannot be said that no standard has been provided by the legislature to guide the program committee in framing a proposed program. The authorities therefore cited by respondents to the effect that where the legislature has failed to provide a standard for the guidance of an administrative body in the performance of its duties. the statute prescribing such duties is unconstitutional because it unlawfully attempts to delegate legislative powers, have no application in the instant case. The Prorate Act is in many respects similar to the oil and gas conservation act of this state (Stats. 1915, p. 1404) construed by this court in the case of *People* v. *Associated Oil Co.,* 211 Cal. 93 [294 Pac. 717]. In that action it was not only held that the act which had for its purpose the prevention of waste of gas produced in this state was within the police power of the state, a question which will be later discussed, but also that a proper standard was provided in the statute for determining when gas is produced in such excessive proportions as to render such production an unreasonable waste of gas. The court in that case (p. 107) said: "It would seem, therefore, that the legislature has plainly adopted the standard so expressed, viz.: that gas may not be produced, under existing conditions where the production thereof so greatly exceeds the market demand therefor, in quantities exceeding a reasonable proportion to the amount of oil produced, as the standard to be applied and beyond which the production is prohibited as being an unreasonable waste of natural gas."

Among the cases cited by respondents is the now famous case of *Panama Refining Co.* v. *Ryan,* 293 U. S. 388 [55 Sup. Ct. 241, 79 L. Ed. 446], in which the Supreme Court of the United States declared unconstitutional the National Industrial Recovery Act. In that case the court held, among other things, that the attempted delegation of power to the president

to interdict the transportation of oil in interstate commerce was void for the reason that nowhere in the act had Congress declared or indicated any policy or standard to guide or limit the president when acting under such delegation. However, in that case the court (p. 421) held that: "The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the legislature is to apply." A large number of decisions are cited in that opinion in which acts of Congress have been sustained, which delegated certain powers to boards or officers to be exercised in accordance with established standards. One of the latest of these cases upheld the Radio Act of 1927 (44 Stats. 1162, 1163), which established a radio commission with authority to grant licenses "as public convenience, interest, or necessity requires". (*Radio Commission* v. *Nelson Brothers Bond & Mortgage Co.*, 289 U. S. 266, 279, 285 [53 Sup. Ct. 627, 77 L. Ed. 1166].) Commenting on the radio case the court in *Panama Refining Co.* v. *Ryan* stated (p. 428): "In construing this provision, the Court found that the statute itself declared the policy as to 'equality of radio broadcasting service, both of transmission and of reception,' and that it conferred authority to make allocations and assignments in order to secure, according to stated criteria, an equitable adjustment in the distribution of facilities. The standard set up was not so indefinite 'as to confer an unlimited power.'" This language is particularly applicable to the question now under discussion in the instant case. The prorate committee is given authority to institute a prorate program, but such program must meet the approval of the prorate commission and must conform to the requirements of section 10 of the act. That the legislative standard prescribed by the Prorate Act of this state complies with the legal requirements approved by the courts of this state is, we think, conclusively established by the following authorities: *Tarpey* v. *McClure*, 190 Cal. 593 [213 Pac. 983], *Gaylord* v. *City of Pasadena*, 175 Cal. 433 [166 Pac. 348], *Kelley* v. *Kingsbury*, 210 Cal. 37 [290 Pac. 885], *Carter* v. *Stevens*, 211 Cal. 281 [295 Pac. 28], *Wood* v. *Pendola*, 1 Cal.

(2d) 435 [35 Pac. (2d) 526, and *A. L. A. Schechter Poultry Corp.* v. *United States of America,* 295 U. S. 495 [55 Sup. Ct. 837, 79 L. Ed. 1570, 97 A. L. R. 947].

Respondents place great reliance upon the recent cases of *Chas. Uhden, Inc.,* v. *Greenough,* 181 Wash. 412 [43 Pac. (2d) 983], *Griffiths* v. *Robinson,* 181 Wash. 438 [43 Pac. (2d) 977], and *State of Washington* v. *Matson Co.,* 183 Wash. 507 [47 Pac. (2d) 1003], decided by the Supreme Court of the state of Washington; also the case of *Van Winkle* v. *Fred Meyer, Inc.,* 151 Or. 455 [49 Pac. (2d) 1140]. But these cases all involved delegations of power to subordinate instrumentalities without prescribing any standard which the administrative body or individual was to follow in the exercise of such power. They are, therefore, not controlling in the present proceedings for the reason already stated.

■ Third. The third ground upon which the respondents contend that the Prorate Act is unconstitutional is that it unlawfully attempts to confer judicial powers upon the prorate commission. The powers of the commission are set forth in the preceding pages of the opinion. The most that can be said respecting the powers bestowed upon the commission is that the commission is granted power to hold hearings and determine facts incidental to the institution of a prorate program over the agricultural commodity named in the petition before it, and, if it finds the facts set forth in the petition to be true, to appoint a committee to prepare and propose such a program and report the same to the commission for its approval. The question thus presented has been so frequently and recently before this court that we deem it unnecessary to do more than refer to our decisions holding that while judicial power may not be delegated to an administrative or legislative body, the mere granting of powers like or similar to those which the prorate committee were empowered to perform, is not against any express or implied provision of the Constitution of this state. The decisions of this court dealing with this question are to be found in *Tarpey* v. *McClure,* 190 Cal. 593, 606 [213 Pac. 983], *Dominguez Land Corp.* v. *Dougherty,* 196 Cal. 468, 483 [238 Pac. 703], *Department of Public Works* v. *Superior Court,* 197 Cal. 215, 220 [239 Pac. 1076], *Globe Cotton Oil Mills* v. *Zellerbach,* 200 Cal. 276, 277 [252 Pac. 1038], and *East Bay Municipal Utility District* v. *Department of Public Works,* 1 Cal. (2d)

476, 478 [35 Pac. (2d) 1027]. In the case of *Globe Cotton Oil Mills* v. *Zellerbach, supra,* this court succinctly stated the law decisive of the question before us as follows (p. 277): "This court is of the view, however, that, admitting that the Fish and Game Commission cannot be granted any power which constitutionally belongs exclusively to the judicial department of the state government, the granting of power to hold hearings and determine facts incidental to the regulation of fish and game, and to the granting of permits to take and use fish, is valid as an administrative or regulatory power, and in nowise transgresses upon the exclusive functions of the judicial department."

Fourth. The last ground of alleged unconstitutionality of the act is that it violates the fifth and fourteenth amendments of the Constitution of the United States and article I, sections 1, 13 and 14 of the Constitution of this state. These sections of our state Constitution provide that no person shall be deprived of liberty or property without due process of law; and that private property shall not be taken or damaged for public use without just compensation. The fifth amendment of the federal Constitution contains similar provisions, while the fourteenth amendment of the United States Constitution provides that no state shall deprive any person of liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the law.

Respondents point out that the Prorate Act absolutely prevents the marketing by every lemon grower in the state of any portion whatever of his lemon crop except as the program committee may determine to be advisable, or in other words that no lemon grower can market any portion of his crop until and unless the program committee says that he may. As a result of the enforcement of the terms of the act, respondents contend that the right of the individual grower to market his crop when and in such manner and under such contracts as he may desire to make is absolutely taken away from him and his liberty of action respecting his own property is destroyed.

This statement of respondents in our opinion correctly interprets the terms of the act as they affect the individual grower of lemons in respect to the harvesting and marketing of any crop of lemons produced by him. Under the terms

of the act the entire crop of lemons grown in the state is made subject to the program instituted by the prorate committee and can only be disposed of in accordance with the program as administered by the committee through the district or zone agent appointed by the committee. No claim is made, however, that the act, as it is enforced through the program instituted by the committee will not act equally and impartially upon all producers of lemons grown in the state and that if there is any benefit to be derived from the observance of the program by the growers that such benefit will be enjoyed ratably by all. Nor is it questioned that if any detriment is sustained by a compliance with the terms of the act, such burden or detriment will rest equally upon all lemon growers in proportion to the amount of lemons which each grower produces. Respondents, however, do maintain that the rights of individual growers over the fruit grown by them cannot be interfered with or in any way controlled in the interest of the industry as a whole, or of the general welfare of the state or its citizens.

The theory of the Prorate Act may be briefly stated as follows: There is an overproduction in many agricultural products of the state. That unless the marketing of the commodity in case of its overproduction is controlled and regulated by the state so that the amount of such product to be produced, harvested and marketed is limited to the amount reasonably necessary to supply the requirements or demands of the market for such commodity, the price of the commodity becomes depressed and drops so low that the market returns do not equal the cost of production. The result of such unregulated sales of commodities has produced "chaotic economic conditions in certain agricultural areas of the State of such severity as to imperil the ability of agricultural producers to contribute in appropriate amounts to the support of the ordinary governmental and educational functions" of the state. The inherent difficulty of any attempt by individuals to adopt such a plan by themselves is referred to in the first section of the act. In this connection, it may be stated that by an affidavit filed in the superior court at the hearing of the application for an injunction and not denied, it is stated that for some ten years immediately prior to the lemon season of 1934–1935, lemon growers producing 90 per cent of the lemons grown in the state voluntarily entered into

a prorate agreement substantially along the lines provided for in the Prorate Act, whereby they limited the marketing and sale through the regular channels of trade of lemons produced by them in an attempt to stabilize the market. The lemons not so sold, to save wasting them entirely, were delivered to by-product plants and sold for a price less than the cost of production. During these same years, the producers of lemons not in said voluntary prorate agreement, while only producing 10 per cent of the crop produced in the state sold through the regular channels of the lemon trade 20 per cent of the lemons so sold. It further appeared from said affidavits that the estimated crop of lemons for the year 1934–1935, being the year to which said prorate program was intended to apply, was 29,000 carloads, and that the average consumption of lemons in the United States for the six years ending October, 1934, practically all of which are produced in this state, was 16,595 carloads. Under these estimates there was a large surplus in the amount of lemons produced during that year over the amount which could be disposed of at a profit in the regular channels of the lemon trade.

It is the contention of applicants that unless regulations like those imposed by the terms of the statute, or something similar thereto, are applied to the production and marketing of the lemon crop of the state, that the industry will be conducted at a loss to the producers with the result that not only will great "agricultural waste" be entailed but that the benefits of this great industry will be eventually lost to the state and to its citizens. This condition was no doubt in the minds of the legislators when they enacted the Prorate Act, as will readily appear from the reading of section 1 of the act. While the legislation infringes upon the rights of the individual, as it denies him the right to produce and harvest his crop of lemons at will, can these individual rights be regulated and subjected to the paramount rights of the public? It is conceded that if such legislation can be upheld it can only be sanctioned by resort to the police power of the state. If the legislative act is within the police power of the state, then the rights of the individual which may be affected thereby must give way to the superior rights of the public, and he cannot complain that his property is taken without due process of law or without compensation first paid to him. (*Graham* v. *Kingwell*, 218 Cal. 658, 660 [24 Pac. (2d) 488];

*Gin S. Chow* v. *City of Santa Barbara,* 217 Cal. 673, 702 [22 Pac. (2d) 5].)

The courts of this state have had frequent occasions to expound the law applicable to the proper exercise of the police power of the state. In a recent case we held that under that power a city by ordinance could establish districts or zones within its boundaries, and limit the uses to which property located in these several zones could be put by the individual owner. (*Miller* v. *Board of Public Works,* 195 Cal. 477, 485 [234 Pac. 381, 38 A. L. R. 1479].) As marking the development and growth of the police power the court in that case said, "In its inception the police power was closely concerned with the preservation of the public peace, safety, morals, and health without specific regard for 'the general welfare'. The increasing complexity of our civilization and institutions later gave rise to cases wherein the promotion of the public welfare was held by the courts to be a legitimate object for the exercise of the police power. As our civic life has developed so has the definition of 'public welfare' until it has been held to embrace regulations 'to promote the economic welfare, public convenience and general prosperity of the community'. (*Chicago, B. & Q. R. Co.* v. *Illinois,* 200 U. S. 561, 592 [4 Ann. Cas. 1175, 50 L. Ed. 596, 26 Sup. Ct. 341].) " In a more recent case we held that it extended to and permitted the regulation of the production of gas and oil in this state even to the curtailment of the amount which could under the terms of the statute be produced. (*People* v. *Associated Oil Co.,* 211 Cal. 93 [294 Pac. 717].) In that case the court sustained the validity of the so-called Oil and Gas Conservation Act. (Stats. 1915, p. 1404.) After an exhaustive discussion of the subject as applied to the power of the state to enact the legislation in question the court concluded: "Whatever refinements may be suggested as to the definition of the nature of the property right in gas and oil beneath the surface and uncaptured, we are entirely satisfied that the waste of these natural resources may be prohibited in the exercise of the police power of the state, and that the statute in question is not subject to the objections first advanced by the petitioners." Other instances where this court has upheld legislation enacted under the police power of the state are as follows: *In re Madera Irr. Dist.,* 92 Cal. 296, 309 [28 Pac. 272, 27 Am. St. Rep. 106, 14 L. R. A. 755] ; *Odd Fellows' Cemetery Assn.* v. *San*

*Francisco,* 140 Cal. 226 [73 Pac. 987] ; *French* v. *Davidson,* 143 Cal. 658 [77 Pac. 663] ; *Laguna Drainage District* v. *Charles Martin Co.,* 144 Cal. 209 [77 Pac. 933] ; *Jardine* v. *City of Pasadena,* 199 Cal. 64 [248 Pac. 225, 48 A. L. R. 509] ; *Spinks* v. *City of Los Angeles,* 220 Cal. 366, 369 [31 Pac. (2d) 193]. In the case of *In re Pedrosian,* 124 Cal. App. 692, 698 [13 Pac. (2d) 389], we find this significant language, "The power has always been as broad as the public welfare. (Citing authorities.) The police power . . . is co-extensive with the necessities of the situation. (Citing authorities.) All property is held subject to the proper exercise of the police power. (*Ex parte Quong Wo,* 161 Cal. 220 [118 Pac. 714].)"

Further authorities might be cited from this and other jurisdictions showing the extent to which the police power has been adapted and applied to the solution of problems involving economic and social conditions of present day life. The principles, however, governing the exercise of this high prerogative of sovereignty have now been so well established and so universally recognized that we will end the discussion of the subject by reference to a few recent cases principally from the Supreme Court of the United States.

Probably the most enlightening as well as the most decisive case, in so far as it relates to the question raised by respondents' contention that the Prorate Act violates the due process clause of the federal Constitution is the recent case of *Nebbia* v. *People of the State of New York,* 291 U. S. 502 [54 Sup. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469]. That action involved the Agriculture and Market Laws of New York, which provided for a Milk Control Board with the power to fix the minimum and maximum retail price to be charged for milk sold by storekeepers. The board fixed the price and Nebbia sold milk below the price fixed. His prosecution followed. He was convicted of a violation of the statute and his conviction was affirmed by the Court of Appeals (*People* v. *Nebbia,* 262 N. Y. 259 [186 N. E. 694]), from which court he carried his case to the Supreme Court of the United States. Both courts upheld the statute as a valid and proper exercise by the state of its police power. In the opinion of the Court of Appeals of New York, we find the following statement of the law (p. 270) : "Doubtless the statute before us would be condemned by an earlier generation as a temerarious interference with the rights of property and contract (*Matter of*

*Jacobs,* 98 N. Y. 98 [50 Am. Rep. 636] ; *Lochner* v. *New York,* 198 U. S. 45 [25 Sup. Ct. 539, 49 L. Ed. 937, 3 Ann. Cas. 1133] ) ; with the natural law of supply and demand. But we must not fail to consider that the police power is the least limitable of the powers of government and that it extends to all the great public needs; that constitutional law is a progressive science; that statutes aiming to establish a standard of social justice, to conform the law to the accepted standards of the community, to stimulate the production of a vital food product by fixing living standards of prices for the producer, are to be interpreted with that degree of liberality which is essential to the attainment of the end in view (*Austin* v. *City of New York, supra,* p. 117) ; and that mere novelty is no objection to legislation. (*People* v. *LaFetra,* 230 N. Y. 429 [130 N. E. 601, 16 A. L. R. 152].)

"The State courts should uphold State regulation whenever possible. They should be clearly convinced that a statute is unconstitutional before they declare it invalid. (*Cf. Ives* v. *South Buffalo Ry. Co.,* 201 N. Y. 271 [94 N. E. 431, Ann. Cas. 1912B, 156, 34 L. R. A. (N. S.) 162], with Arizona Employers' Liability Cases, *supra,* (250 U. S. 400 [39 Sup. Ct. 553, 63 L. Ed. 1058, 6 A. L. R. 1537] ) ; also *cf. People* v. *Coler,* 166 N. Y. 1 [59 N. E. 716, 82 Am. St. Rep. 605, 52 L. R. A. 814] , with *Atkin* v. *Kansas, supra,* (191 U. S. 207 [24 Sup. Ct. 124, 48 L. Ed. 148] ).)"

Before the Supreme Court of the United States, Nebbia advanced the argument in support of his claim that the statute was unconstitutional that the milk business was not subject to legislative control as it was not so affected with a public use. as to bring it within that type of business which public interest demands or even permits to be regulated. The court after referring to the case of *Munn* v. *Illinois,* 94 U. S. 113 [24 L. Ed. 77], in which a state statute regulating elevator charges was sustained, went on to say: "The true interpretation of the court's language (in *Munn* v. *Illinois*) is claimed to be that only property voluntarily devoted to a known public use is subject to regulation as to rates. But obviously Munn and Scott had not voluntarily dedicated their business to a public use. They intended only to conduct it as private citizens, and they insisted that they had done nothing which gave the public an interest in their transactions or conferred any right of regulation. The statement that one has dedicated

his property to a public use is, therefore, merely another way of saying that if one embarks in a business which public interest demands shall be regulated, he must know regulation will ensue.'' The court in its opinion had already referred to the conditions existing in the milk business in the state of New York due to demoralizing competition resulting in destructive price-cutting practices by retail stores. The condition there described is in many respects similar to that which exists in the lemon industry in this state as disclosed by the record herein. In view of those existing conditions the court held that the business was subject to control and regulation and sustained the order fixing the retail price thereof. We quote that portion of the opinion found on page 530: ''The milk industry of New York has been the subject of long-standing and drastic regulation in the public interest. The legislative investigation of 1932 was persuasive of the fact that for this and other reasons unrestricted competition aggravated existing evils and the normal law of supply and demand was insufficient to correct maladjustments detrimental to the community. The inquiry disclosed destructive and demoralizing competitive conditions and unfair trade practices which resulted in retail price cutting and reduced the income of the farmer below the cost of production. We do not understand the appellant to deny that in these circumstances the legislature might reasonably consider further regulation and control desirable for protection of the industry and the consuming public. That body believed conditions could be improved by preventing destructive price-cutting by stores which, due to the flood of surplus milk, were able to buy at much lower prices than the larger distributors and to sell without incurring the delivery costs of the latter. In the order of which complaint is made the milk control board fixed a price of 10 cents per quart for sales by a distributor to a consumer, and 9 cents by a store to a consumer, thus recognizing the lower costs of the store, and endeavoring to establish a differential which would be just to both. In the light of the facts the order appears not to be unreasonable or arbitrary, or without relation to the purpose to prevent ruthless competition from destroying the wholesale price structure on which the farmer depends for his livelihood, and the community for an assured supply of milk.''

The court in the Nebbia case then proceeds to discuss the claim of the appellant that the New York act violated the due process clause of the federal Constitution. In answer to this contention the court declared its position as follows (page 537):

"So far as the requirement of due process is concerned, and in the absence of other constitutional restrictions, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a propr legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court *functus officio.* 'Whether the free operation of the normal laws of competition is a wise and wholesome rule for trade and commerce is an economic question which this court need not consider or determine.' (*Northern Securities Co.* v. *United States,* 193 U. S. 197, 337, 338 [24 Sup. Ct. 436, 457, 48 L. Ed. 679].) And it is equally clear that if the legislative policy be to curb unrestrained and harmful competition by measures which are not arbitrary or discriminatory it does not lie with the courts to determine that the rule is unwise. With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal. The course of decision in this court exhibits a firm adherence to these principles. Times without number we have said that the legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power.

"The lawmaking bodies have in the past endeavored to promote free competition by laws aimed at trusts and monopolies. The consequent interference with private property and freedom of contract has not availed with the courts to set these enactments aside as denying due process. Where the public interest was deemed to require the fixing of minimum prices,

that expedient has been sustained. If the lawmaking body within its sphere of government concludes that the conditions or practices in an industry make unrestricted competition an inadequate safeguard of the consumer's interests, produce waste harmful to the public, threaten ultimately to cut off the supply of a commodity needed by the public, or portend the destruction of the industry itself, appropriate statutes passed in an honest effort to correct the threatened consequences may not be set aside because the regulation adopted fixes prices reasonably deemed by the Legislature to be fair to those engaged in the industry and to the consuming public. And this is especially so where, as here, the economic maladjustment is one of price, which threatens harm to the producer at one end of the series and the consumer at the other. The Constitution does not secure to anyone liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people. Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the Legislature is freed to adopt, and hence an unnecessary and unwarranted interference with individual liberty.''

In a still later case the United States Supreme Court upheld as constitutional the Milk Control Act of New York under which an order fixing a differential of one cent per quart on sales of milk to stores in favor of milk dealers not having a ''well advertised trade name''. (*Borden's Farm Products Co.* v. *Ten Eyck*, 297 U. S. 251 [56 Sup. Ct. 453, 80 L. Ed. ——], No. 597, October Term, 1935.) While the order in question was to continue only for a limited period of time we think the principle enunciated by the court in sustaining its validity is pertinent to the decision of the point now under consideration in the instant case. In sustaining the order, the court said: ''In enforcing its policy of price fixing,—a temporary expedient to redress an injurious economic condition,— the legislature believed that a fixed minimum price by dealers to stores would not preserve the existing economic method of attaining equality of opportunity. That method was for the well-advertised dealers to rely on their advertising to obtain a given price, and for the independents to retain their share of

the market, not by counter-advertising but by a slight reduction of price. The one expedient the law did not purport to touch; the other by fixing the same minimum for all dealers it would effectually destroy. In these circumstances, it was competent to the law makers to attempt, during the limited term of the legislative experiment, to preserve the existing relationship of advantage established by the past trade practices of the two groups. So to do, we must assume, was within the legislative power under the state Constitution. No prohibition of the expedient is found in the federal Constitution, unless in the Fourteenth Amendment. We have held that article does not prevent the fixing of maximum and minimum prices for milk, in the circumstances existing in the state of New York in 1933. We now hold that to provide that a differential of one cent maintained by the independent dealers shall continue does not deny their advertised competitors equal protection. There was a plain reason for the classification. It was not merely that appellant had established a good will; it was that there had resulted a balance between that advantage and the resulting disadvantage to the unadvertised dealer,—a balance maintained by a price differential. To attempt the maintenance of that balance was to strive for equality of treatment, equality of burden, not to create inequality. To adapt the law to the existing trade practice was neither unreasonable nor arbitrary."

It will be noted that the court in neither of the opinions just referred to places its decision upholding the statutes regulating the milk industry of the state of New York upon the ground that the enactment of such legislation was necessary to promote the public health. On the other hand, it was expressly stated in the Nebbia case, and at least implied in the other, that the property respecting which the legislation was enacted was "affected with a public interest", or "clothed with a public use".

Respondents rely upon a number of earlier cases, principally from the Supreme Court of the United States, among which are the following: *Williams* v. *Standard Oil Co.*, 278 U. S. 235 [49 Sup. Ct. 115, 73 L. Ed. 287, 60 A. L. R. 596], *Wolff Packing Co.* v. *Court of Industrial Relations*, 262 U. S. 522 [43 Sup. Ct. 630, 67 L. Ed. 1103, 27 A. L. R. 1280], *Tyson & Bro.-United Theatre Ticket Offices* v. *Banton*, 273

U. S. 418 [47 Sup. Ct. 426, 71 L. Ed. 718, 58 A. L. R. 1236], *Fairmont Creamery Co.* v. *Minnesota,* 274 U. S. 1 [47 Sup. Ct. 506, 71 L. Ed. 893, 52 A. L. R. 163], and *Ribnik* v. *McBride,* 277 U. S. 350 [48 Sup. Ct. 545, 72 L. Ed. 913, 56 A. L. R. 1327]. These cases are all cited in the dissenting opinion in the Nebbia case. They were, of course, called to the attention of the court, but evidently a majority of the court did not choose to follow them.

Under the authorities cited herein, we are of the opinion that the Prorate Act does not violate the due process clauses of the state and federal Constitutions, nor those sections which provide against the taking of private property for public use. Neither is the act in conflict with the federal Constitution which accords to all persons the equal protection of the law. If the state has the authority to fix the price at which a commodity such as milk may be sold and thus avoid the ruinous effect of unrestrained competition, as we understand the decisions of the highest court in this land so held, we can see no difference in principle in a state statute which attempts to regulate the production and marketing of a commodity, where without such regulation the industry would be practically destroyed to the great detriment not only of those engaged therein but to the state and its citizens as well.

The lemon industry which is directly concerned in this proceeding, as appears by the record before us, affects an exceedingly large number of citizens of the state. The investment therein runs into millions of dollars. Its success contributes in a large measure to the prosperity of the state, and its destruction would be no less than a public calamity, not only to this state but to all those residing without its limits. We do not feel that we are in any way or to any extent extending the principles of law enunciated in the authorities cited above by holding that such a business is so affected with a public interest or clothed with a public use as to justify the state in the exercise of its police power to impose such reasonable regulations upon the quantity of the commodity that may be produced and marketed therein as will save the industry from destruction from ruthless competition, the direct effect of overproduction. The restraint imposed by the statute operates only upon the quantity to be produced, and the amount to be marketed. After securing

the secondary certificate permitting the marketing of his proportionate amount of lemons produced, the lemon grower is then left free to sell such amount at whatever price he may receive and to whomsoever may desire to purchase the same. The limitation simply limits the amount to be marketed and does not extend to or affect the sale of the commodity. As before stated, the terms of the act apply equally upon all growers, and distributes the benefits and burdens among them in proportion to the amount of fruit produced by them. The act is therefore neither arbitrary nor discriminatory. It cannot be said that any person affected thereby is denied the equal protection of the law.

This concludes the discussion of the grounds of unconstitutionality advanced and relied upon by the respondents in their attack upon the validity of the Prorate Act. As we have indicated in our opinion, they are not well founded, and they afford, neither singly nor collectively any legal reason for invalidating the act. We think it reasonably complies with all the requirements of the state and federal Constitutions, and its enactment was within the power of the legislature, as that power is defined and limited by the organic law of our state and federal governments.

Respondents make the further contention that even if the Prorate Act is constitutional, the procedure provided therein for the formation of a district was not regularly followed in the formation and organization, and therefore all orders thereafter made by the commission or the committee are invalid and void. Respondents specify two respects in which they contend that the original petition for the formation of the district is so defective as to render the whole proceedings thereon of no binding effect whatever upon them, or upon any person. As we have seen, the petition for the formation of a district or zone must be signed by not less than fifty producers of the commodity within the proposed prorating zone; provided that if it be alleged in said petition that it is signed by two-thirds or more in number of the producers of said commodity within the proposed zone and by the owners of a two-thirds or more in number of the producing factors of said commodity in said proposed zone, the number of signers shall be immaterial. It is further provided in the act that if the petition is signed by the owners of two-thirds

or more of the producing factors and two-thirds of the producers of the commodity concerned, it need not contain a request for an election, and if it is so alleged in the petition, and at the hearing the commission finds said allegation to be true, then upon proof of the other necessary matters set forth in the petition, the commission may order the formation of the district or zone without the calling of an election. In the petition which was the foundation of the proceedings involved herein, it was alleged that it was signed by the necessary two-thirds of the producing factors and two-thirds of the producers of lemons within the proposed district, and the commission found this allegation to be true and ordered the formation of the district without an election being held in the proposed district to determine whether the district should be so formed. As stated before, in the petition it was alleged that the producing factor for the purposes of the proceeding is specified as a standard box of lemons, based on the crop season from November 1, 1933, to October 31, 1934. This basis was accepted by the commission and used and acted upon in the proceeding leading up to the organization of the district. Respondents now contend that this basis was erroneous and fatally defective in that the commission had no right to accept the packed box as the producing factor in order to determine whether the petition contained the required number of signatures to entitle the commission to order the district formed without an election, and furthermore the action of the commission was equally erroneous and unauthorized in selecting the past season of 1933–1934 instead of the current season of 1934–1935 as the basis of determining whether the petition contained the required number of signatures to authorize the formation of a district without an election.

In support of the first of these two contentions, respondents assert that the term, ''producing factor'', cannot be said to apply to a packed box of lemons or to any other integral part of that which is produced, but by the use of these words the legislature intended to refer not to any portion of the commodity which was produced, but to the factor which produced the commodity, such as a lemon tree or an acre of lemons. We would be much inclined to agree with respondents were it not for the definition of ''producing factor'' given in the statute itself. By subdivision 2 (h) of the act,

"The term, 'producing factor' means the unit of production specified in the petition." As we have seen the petition specified a standard packed box of lemons as the producing factor for the purpose of said proceeding. From the definition given in the act of the term, "producing factor" as "a unit of production", we think it well may mean some definite part of that which is produced, and that in specifying such unit of production as a packed box of lemons the petition was within and complied with the terms of the act.

As to the specification of the crop of the past year instead of that of the current year as the basis of determining whether the petition contained the requisite number of signatures, it seems that the petition was dated February 19, 1935. It is conceded that at that date but a small part of the lemon crop of the season had been harvested. Any attempt to fix the exact amount of such crop would be by an estimate of lemons then on the trees. It would be impossible to definitely determine the amount of the crop by a mere estimate so made. On the other hand, the amount of lemons produced the previous year was certain and definitely fixed. By referring to the records of the previous year, the total production of lemons in the state could be ascertained and also the several amounts produced by each individual grower. No attempt was made to show that the adoption of the previous year's crop as a basis of determination worked any injustice or hardship on any grower. On the other hand, the plan adopted was fair and just to all growers. It worked for certainty and definiteness, and in most respects was preferable to a procedure depending upon the uncertain method of a mere estimate of what might be produced during the current year. This resort to the previous year's crop was only had for the purpose of fixing some basis upon which to institute proceedings for the formation of the district. The previous year's crop did not enter into the future acts of the committee in prorating crops thereafter to be produced and made the subject of proration. The proration of any future crop would be governed entirely by the amount of such crop and the individual production of each grower. We therefore are of the opinion that the specification of a standard packed box of lemons in the petition as a basis of determining whether

the requisite number of owners had signed the petition was a substantial compliance with the terms of the act.

In the injunction suit before the respondent court the plaintiffs therein made the claim that the prorate district in which the applicants were purporting to act as officers was never legally formed or organized in that the petition for the formation of said district was never signed by the necessary two-thirds of the lemon producers residing in said proposed district or zone, and therefore the commission had no authority to make its order organizing said district without an election being held therein to pass upon the question of the formation of said district. This claim on the part of said plaintiffs was set forth in paragraph XX of their complaint in which it is alleged among other things that "said petition was not signed by two-thirds or more in number of the producers of lemons in California, nor by the owners of two-thirds or more of the producing factors of lemons in California". If that allegation is true, then the district was not legally formed or organized, and if it was not so organized, an injunction against the applicants restraining them from executing the terms of said act would lie. On the hearing of the application for a temporary injunction, an affidavit was filed which purported to deny the allegations of paragraph XX of the said complaint. There is nothing, however, in the record before us to indicate that the respondent court has ever passed upon the issue tendered by the allegations of said paragraph XX. In fact, it would be rather unusual for the court to finally pass upon an issue of fact on an application for a temporary injunction. This issue of fact, however, was presented by the plaintiffs in the injunction suit and the court had jurisdiction to decide it. So far it has never done so. The injunction suit is still in the respondent court, and that court has exclusive jurisdiction to hear and determine all undecided issues of facts presented by the pleadings in said suit. Should it determine that said district was legally organized and that the orders which the plaintiffs in said action seek to restrain are valid and binding upon those to whom they are directed, then it would be the duty of said court to deny the injunction and dismiss the suit. On the other hand, should the trial court find in favor of the plaintiffs in said suit upon the allegations of said para-

graph XX, then it would necessarily follow that said orders would have no legal support and the defendants in said suit should be enjoined from enforcing them. For this reason the application for a writ of prohibition directed to respondents restraining them from proceeding in said action should be denied.

It is, therefore, ordered that the petition herein be denied, and the alternative writ heretofore issued be discharged.

Waste, C. J., Langdon, J., Seawell, J., and Shenk, J., concurred.

THOMPSON, J., Concurring.—I concur in the conclusion reached herein that the peremptory writ of prohibition should not issue, but I think it inappropriate in this proceeding to discuss the constitutionality of the act under which the petitioners are proceeding to act or whether the packed box of lemons constitutes a producing factor within the meaning of the act. A writ of prohibition will not lie where the court is exercising, but not exceeding nor threatening to exceed its jurisdiction. The respondent court has jurisdiction in the present case not only for the reason pointed out in the majority opinion but also by reason of section 17 of the act, which, section, while relied upon by the respondents, has not heretofore been discussed. It reads as follows: "Any order of the commission instituting a proration program and any order of the commission substantially affecting the rights of any interested party may be reviewed by any court of competent jurisdiction. Any such action must be commenced within thirty days after the effective date of the order complained of or within thirty days after the injurious effect complained of." Making the meaning of the legislature in this regard more patent is the provision in section 9 for keeping all the evidence, exhibits, data and transcript at a central point available to all interested parties. The complaint of the respondents, after alleging that the commission exceeded its jurisdiction, not only because of the unconstitutionality of the act but also because the requisite facts were not proven and because petitioner adopted as a producing factor a unit which was a measure of the production rather than one which the producer "may be expected to utilize for production pur-

poses in the ensuing season", asks not only for injunctive relief but also that the "court issue such other or different writs herein as to the court shall seem fit and proper and necessary for the protection of the plaintiffs". It is thus made obvious that plaintiffs brought themselves within the spirit and letter of section 17, quoted above. When we bear in mind that the act in question seeks to make provision for the institution of a proration program for any agricultural commodity, it becomes of extreme importance that the trial court be, unhampered in its duty of determining when a commodity is "affected with a public interest" so as to justify the compulsory regulation of nonconsenting producers. Aside, therefore, from the usual rules of procedure which dictate that in a proceeding of this character we should only inquire into the jurisdiction of the respondent court, there is the additional reason in this case that the trial court is clothed with the direct authority to make the inquiry and adjudge the cause. We should not attempt to prejudge or dictate how it shall exercise its jurisdiction. The petitioners may well appeal if the court erroneously decides the case against them, and we shall be better able to discharge our function when the case is fully developed.

Rehearing denied. Shenk, J., and Thompson, J., voted for a rehearing. Conrey, J., being disqualified, did not participate herein.