This is an appeal from an order admitting to probate one of two wills and rejecting the other.
Two separate proceedings originally begun for the probate of the respective wills were consolidated, and subsequent proceedings have been conducted under the title of the consolidated estate. It is conceded that the first will, the one that was admitted by the court, was in all respects legally executed. It is also conceded that the second, or later, will, the one that was rejected, was signed by the testator and properly witnessed. The controversy here concerns the validity of the second will.
The attack upon the second will was upon two grounds: (1) That the testator was lacking in testamentary capacity at the time of making the will; and (2) that the will was executed under duress, menace, fraud and undue influence. The court found against the first ground of attack, but sustained the second ground. The order made by the court, after reciting certain findings, concluded by admitting the first will to probate and rejecting the second. The proponents of the first will excepted to the finding of the court with respect to the first ground of their attack on the second will, and the proponent of the second will excepted to the court's ruling generally. This appeal was taken by the proponent of the second will. For convenience, we shall refer to the proponents of the first will as respondents, and to the proponent of the second will as appellant. *Page 505 
 [1] In their argument, counsel for appellant proceed upon the theory that the only question properly before us is whether the second will was procured through duress, fraud, menace and undue influence. Their contention is that, inasmuch as respondents have not cross-appealed from that portion of the order which found that the testator was mentally competent at the time of making the second will, they are now foreclosed from raising that question. The respondents, on the other hand, assert that the question of testamentary capacity and the question of fraud and undue influence are both before us for consideration. In view of the conclusion that we have reached upon the record in this case, it becomes necessary for us initially to dispose of the question as to what issues are before us.
Proceedings of this kind are equitable in nature. In reMcCombs' Estate, 164 Wn. 339, 366, 2 P.2d 692. They are, therefore, upon appeal, triable de novo on the entire record.Tucker v. Inglish, 135 Wn. 146, 237 P. 297; Darrell v.Salwt, 138 Wn. 353, 244 P. 563; Sterling Chain Theaters v.Central Labor Council, 155 Wn. 217, 283 P. 1081.
Upon such trial de novo, the record may be examined to determine whether the evidence sustains the findings in some particular respect, and, if it be found upon the record that the judgment entered is a proper one, it should be affirmed, even though the basis upon which it was originally founded be an unsound one. In Huntington v. Love, 56 Wn. 674, 106 P. 185, the trial court had made a finding of insanity of one of the parties. On appeal, this court held that upon the findings as made the judgment would have to be reversed, but that an examination of the record disclosed that the findings were contrary to the evidence. In *Page 506 
affirming the judgment, after disapproval of the findings, this court said, p. 678:
"We hold, however, upon the record before us, that the respondents are not concluded by the findings made, they having excepted thereto. All of the evidence has been properly certified to this court in a statement of facts, the cause is before us for trial de novo, and it is our duty to examine the entire record and determine whether the evidence sustains the findings to which the respondents have interposed timely and proper exceptions. They were not aggrieved by the final judgment. It was satisfactory to them. They contend it was right, and could not appeal therefrom. If the proper judgment has been entered, it should be sustained, as respondents are entitled to have it affirmed, even though it may have been reached by unsound reasoning."
We have a similar situation here. All of the evidence has been properly certified to this court in a statement of facts, and, assuming even that it was necessary to except to the objectionable finding, the record discloses that the exception was properly taken. We therefore have before us, on this appeal, the same issues as were before the trial court.
With this introduction, we proceed to an examination of the evidence.
The testator, Nicholas Ney, who was of German and French extraction, was born in the province of Luxemburg in 1848. He had eight sisters and one brother. In 1882, he came to America and took up farming in the Big Bend country, in this state. At or about the same time, three of his sisters and their husbands also came to this country and located in the same community. These sisters were Mrs. Katherine Bodeau, Mrs. Marie Kramer, who later became Mrs. McCormick, and a Mrs. Hoss. Among Mr. Ney's relatives in Luxemburg was another sister whose married name was likewise Bodeau, and who had a daughter *Page 507 
by the name of Katherine. Having occasion herein to refer to two persons bearing the same name, we shall at times, in order to avoid confusion, speak of Mrs. Katherine Bodeau as the sister, and Miss Katherine Bodeau as the niece.
Mr. Ney was married twice, but had no children. His second wife died in 1920, and from that time until his death in 1934, he remained a widower.
By dint of hard work and exceptional thrift and industry, Mr. Ney acquired extensive farm-land holdings near Wilbur. After accumulating considerable wealth, he moved to Spokane and acquired some lots on North Division street, which he improved with a number of buildings, in one of which he lived with his sister Mrs. Hoss, who was then a widow. It does not clearly appear when the move to Spokane was made, but apparently it was after the death of Mr. Ney's second wife. It was probably some time between 1924 and 1927.
In 1900, Mr. Ney had made a trip to Europe to visit his relatives. While there, he prevailed upon his niece, Miss Katherine Bodeau, of whom he was very fond, to come to this country. The following year, the niece, who was then eighteen years of age, came to America, her transportation and expense being paid by her uncle. During the next few years, the niece spent her time with her uncle and her sister, Mrs. Sheffel, who also resided in the Big Bend country.
In the meantime, the niece entered school to prepare herself for some gainful pursuit in the business world. After completing her schooling, she remained in Spokane for a few years and then went to Baker, Oregon, to keep house for her brother and do office work. Later, she went to Portland, where she kept books in a bank and subsequently in a hospital at a salary of one hundred and fifty dollars a month. This was about the *Page 508 
year 1928. During the time of her residence in Oregon, the niece made frequent trips to Spokane and the surrounding country, visiting her uncle, her aunt Mrs. Hoss, and her sister Mrs. Sheffel. In the meantime, also, Mr. Ney had lost his second wife and was living in Spokane with his sister Mrs. Hoss.
Upon the occasion of her later visits, the niece had many confidential conversations with her uncle, in which he broached the subject of her coming to live with, and take care of, him. Corroborative of Mr. Ney's extreme fondness for his niece and of his desire to have her make her home with him and to manage his affairs, are a number of his letters to her. These letters also disclose considerable feeling on his part against the two sisters, Mrs. McCormick and Mrs. Katherine Bodeau.
In a letter dated September 15, 1928, Mr. Ney expressed great concern for the niece, who at that time was suffering from arthritis. He also expressed his desire that she come and live with him, as soon as she had recovered, and be his child, saying that he was saving for her welfare, and that the others could "keep their mouths shut." The letter indicated that "the others" wanted him to spend his money so that there would be no fight over it afterwards, but that he intended to fix it so that there would not be any trouble in that respect. In the same letter, he suggested that the niece become his bookkeeper.
A second letter bears date October 4, 1928. It refers to the other relatives and contains this significant paragraph:
"I helped all of them also in the first years here but they do not want to hear of it, as if it had been my duty I put them on the best location and thru that they have become rich, and made me trouble from the start. Now they want to be nice to me to inherit from my estate which can never be." *Page 509 
The reference to the relatives evidently did not include the sister, Mrs. Hoss, for apparently Mr. Ney had been living with her upon good terms, and besides, when these letters were written, she was dead.
In the fall of 1928, the exact date not being shown, Mr. Ney wrote another letter to the niece, saying that he was preparing his own meals, but that it was no way to live, and that he wanted to build a bungalow in which she could live with him.
In a letter dated January 9, 1929, Mr. Ney inquired of the niece when she was coming to Spokane. In the same letter, he complained that Mrs. Kramer McCormick had become rich through his assistance, but that she nevertheless wanted him to include her in his will, which he characterized as being unreasonable, in view of all that he had already done for her.
These are but a few of the letters that the old gentleman, then about eighty years of age, wrote to his niece upon the subject of her coming to make her home with him. We quote from them to show his preference for his niece, his desire to have her come to live with him, and the estrangement that existed between him and his two sisters, one of whom is the appellant here, and the other of whom, Mrs. Bodeau, is now dead.
In January, 1929, Mr. Ney sustained a broken hip and was confined in the Sacred Heart Hospital in Spokane until about May 1st of that year. While there, on February 26, 1929, he executed the first will mentioned above, the one that was ultimately admitted to probate. The will was prepared by Mr. Joseph McCarthy, who had been Mr. Ney's attorney and legal adviser for many years. The will distributed the testator's property as follows:

 (1) To Henry Mollinger, an uncle, of Paris, France ........ $400
 (2) To the Catholic Church at Wilbur ...................... 100
 *Page 510 
 (3) To St. Aloysius Church at Spokane ..................... 100
 (4) To St. Joseph's Orphanage at Spokane .................. 100
 (5) To Knights of Columbus ................................ 100

The remainder as follows:
 (6) To Mary Diedesch, a niece, daughter of Mrs. Hoss ...... 11%
 (7) To Charles Bodeau, a nephew, the brother of
 Katherine Bodeau, the niece ........................... 11%
 (8) To Katherine Bodeau, the niece ........................ 23%
 (9) To the children of Anna Bisenius, a sister in
 Luxemburg ............................................. 11%
(10) To Katherine Bodeau, a sister, then living near
 Wilbur ................................................ 11%
(11) To Josephine Guillaume, a sister in France ............ 11%
(12) To Marguerite Gasper, a sister in Belgium ............. 11%
(13) To Marie Kramer (McCormick), a sister, the
 appellant ............................................. 11%

The above named Mary Diedesch and Charles Bodeau and a brother-in-law, Theodore Bodeau (since deceased), were appointed executors of the will.
It will be observed that, by this will, the niece Katherine Bodeau was to receive twenty-three per cent of the remainder of the estate, while the others, either individually or by classes, were to receive only eleven per cent.
At the time that this will was executed, the niece had not yet come to Spokane, but was still in Oregon, or else in California, and it does not appear that she then knew that Mr. Ney had made the will. However, the old gentleman's accident seems to have hastened her coming. At any rate, she came to Spokane about the middle of April, 1929. Upon her arrival and while Mr. Ney was still in the hospital, he executed a power of attorney which gave her the authority to take care of his property, rent the apartments which he owned, and collect the rents. The power of attorney was witnessed by Dr. McCormick, the husband of the appellant, and by Mrs. Diedesch, a niece. *Page 511 
About this time, an event occurred which, it is quite apparent from the record, has been the factor that has caused this litigation.
After the arrival of the niece in Spokane and while Mr. Ney was still in the hospital, the uncle and niece had several conversations relative to his deeding to her a half section of land in Lincoln county, worth ten thousand dollars or more. Although he had but a few months before executed his will disposing of all of his property, Mr. Ney appears to have become desirous of giving his niece something more, because she had come to live with him and was taking care of his affairs. The niece mentioned the matter of her uncle's desire to her cousin, Emil Kramer, who was the son of appellant Marie Kramer McCormick. She subsequently went to Mr. McCarthy to have the deed prepared. Mr. McCarthy declined to prepare the deed, and the niece then went to attorney E.H. Belden of Spokane.
After Mr. Belden had prepared the deed, he mailed it to Mr. Ney, who in the meantime had been taken from the hospital to his home on North Division street, where the niece was taking care of him with the help of a nurse. Mr. Ney retained the deed in his possession for several weeks, until August 3, 1929, when he executed it at a bank in the presence of the nurse and an employee of the bank.
By the deed, Mr. Ney transferred the half section of land to his niece, but reserved a life estate in himself with the right to all the rents, issues and profits during his lifetime. This deed is not made the subject of any legal attack in these proceedings. It was, however, the torch that inspired the subsequent conflagration.
The appellant and her sister, Mrs. Bodeau, became suspicious that Mr. Ney had executed the deed, and their examination of the public records confirmed their *Page 512 
suspicion in that respect. According to the testimony of appellant, Mrs. McCormick, Mr. Ney appeared to be very much worried about something, and when she and her sister Mrs. Bodeau charged him with having given the land to the niece, he admitted the fact, and further stated that he had been forced into doing so; also, that he had tried to get his land back, but that his request had been refused by the niece.
On August 20, 1929, about three weeks after giving the deed, Mr. Ney suffered a mental breakdown, going completely out of his mind. The attack came on very suddenly and was quite violent. Coming into the house from the woodshed, whither he had gone to get some kindling, he suddenly and without any warning struck the nurse, knocking her against the stove, and at the same time exclaimed: "Damn you, you stole my wife." As already stated, Mr. Ney's wife had died many years before. Following the attack, he took some books and papers from the house and carried them to a garage, and a little later brought them back and attempted to hide them under a culvert in a vacant lot.
A doctor was called, and through his efforts the old gentleman was brought back to the house and was given medicine, which quieted him somewhat. A consultation of the family, including the two sisters, resulted in his being taken to the home of Mrs. Bodeau, near Wilbur, where he remained for about a month. He was then brought back to Spokane and after a few days was placed in the St. Joseph's Home, where he remained about a week. During that time he became very unruly and even violent. He would not eat with the other inmates, being suspicious that some one would poison him. He became very noisy and boisterous at night and would ramble around from place to place, trying to climb over the third floor porch wall. *Page 513 
He would frequently try to strike the nurses and on one occasion broke a lamp shade with his cane. At times he would cry out, "Help, murder, they are trying to kill me."
The St. Joseph's Home being unable to keep Mr. Ney, Dr. McCormick, appellant's husband, had him removed to a private sanitarium conducted by Dr. Aldrich at Moran Prairie, five or six miles out of Spokane. Dr. Aldrich then examined Mr. Ney and found that he was on the verge of dementia praecox. He became very melancholy and vicious. At times it was necessary to put him in a strait-jacket from two to six hours before he could be quieted. Mental suggestion was also used upon him, with some success. On one occasion he said to Dr. Aldrich, "I am going to get you right now," and immediately broke his cane over the doctor's head. In his conversation, he was irrational. He had no control over his excretory organs and required almost constant attention by a nurse. His condition grew progressively worse during the fall of 1929. If left alone, he would try to escape. The doctor testified that, in his opinion, he was not competent to make a will during the time that he was at the sanitarium, which was from September, 1929, to June, 1930.
We must now go back a bit in point of time. On September 10, 1929, while Mr. Ney was at the St. Joseph's Home, the appellant and her sister Mrs. Bodeau, through Mr. McCarthy, their attorney, filed a petition in the superior court alleging that their brother was incompetent and praying that they, or some suitable person, be granted letters of guardianship. The matter came on for hearing on November 26, 1929, at which time considerable evidence was taken, including the testimony of Mr. Ney himself. The result was that the court appointed, not the appellant *Page 514 
nor Mrs. Bodeau, but the niece and the Old National Bank and Union Trust Company as guardians. The two sisters objected to the appointment of the niece.
In the course of its oral decision, the court said:
"No complaint was voiced so far as this record shows by anybody concerning the contact between the uncle and his niece until it was disclosed that a deed had been placed on record, conveying to the niece what remained of a piece of real estate out in the Big Bend country, the deed reserving for the benefit of the uncle the life estate, the income, revenue and everything else that he could possibly have any interest in during his life. From that moment great interest is manifested in his welfare. Suspicion is aroused that somebody is getting an advantage; lawsuits are threatened; trouble starts; this poor old gentleman made the victim of all this anxiety."
The testimony given by Mr. Ney at the hearing discloses that he was irrational. We need not recount its details.
Another matter is worthy of note at this point, as bearing somewhat on subsequent events. On August 22, 1929, two days after Mr. Ney's mental collapse, the sister Mrs. Katherine Bodeau procured from him a note in the sum of six thousand dollars. Mr. and Mrs. Bodeau were at that time indebted to Mr. Ney in the sum of ten thousand dollars. It appears that, in 1931, Mr. and Mrs. Bodeau brought suit upon the six-thousand-dollar note, and, upon the trial of that case, the court found that, if the note were ever executed at all, it was without consideration, and that Nicholas Ney was at that time, and at all times since, mentally incapable of contracting the indebtedness evidenced by the note.
Still another matter has a bearing upon the subject. In April, 1931, the sisters began an action in the superior *Page 515 
court against the niece to set aside the deed which Mr. Ney had given her on August 3, 1929. In their complaint, sworn to by both of them, the sisters alleged that, at the time of executing the deed, Mr. Ney was mentally incompetent and wholly incapable of delivering the deed, and that on December 4, 1929, he was declared incompetent by the superior court. That suit came to naught. We mention it here only because it indicates knowledge on the part of appellant and Mrs. Bodeau that Mr. Ney was mentally incompetent in the latter part of 1929.
We now come to the matter of the execution of the second will, and are met with a most unusual train of circumstances, as disclosed by the evidence adduced on behalf of appellant. It will be borne in mind that Mr. Ney had suffered a complete mental breakdown on August 20, 1929; that he had been declared incompetent, upon the petition of the sisters; that his financial affairs were being conducted through his guardians; and that he had been confined in two institutions, where his conduct had been almost continuously irrational and very frequently violent and vicious. Mr. McCarthy's connection with Mr. Ney's affairs came to an end about this time, and another attorney, who is not one of the attorneys of record in this case, was employed to handle subsequent matters. We shall refer to the second attorney simply as the attorney. Most of the evidence as to what subsequently occurred comes from the attorney and the appellant.
It appears that the attorney became acquainted with Mr. Ney about December 1, 1929, while Mr. Ney was at the Aldrich sanitarium. The attorney was not certain as to who had called him to come to the sanitarium, but Dr. Aldrich testified that it was either Dr. McCormick or the appellant, Mrs. McCormick. At any rate, the immediate purpose of the visit was to discuss *Page 516 
with Mr. Ney a matter concerning a deed which Mr. Ney had given some lady, presumably the niece. The conversation then turned upon the matter of Mr. Ney's executing a will.
The next day, Mr. Ney suddenly appeared at the home of Mrs. McCormick, six or seven miles from the sanitarium. How he got there, no one seems to know, or at any rate it was not disclosed. Dr. and Mrs. McCormick and Mrs. McCormick's son were at home at the time. According to the testimony of appellant, the sister, Mrs. Bodeau, who lived in the country, by chance also arrived at the McCormick home about the same time. Shortly thereafter, the attorney appeared, unsolicited by the appellant and without any knowledge that he was coming.
With him came two physicians, whose purpose it was to examine Mr. Ney and certify as to his mental competency, if they found him competent; this, too, was without the solicitation or previous knowledge of the appellant or any member of her family. The attorney did not know that Mr. Ney had been declared incompetent, and no one told him of it. To use his own words, "I wouldn't have drawn the will if I knew this man had been declared incompetent." The doctors examined Mr. Ney and certified in writing as follows:
"Mr. Ney is suffering from the changes common to normal senility, ordinarily found in persons of his age, 81 years, but there were no symptoms of abnormal senility. He had a clear conception of his property, where it was situated, and its probable value. He understood the natural and legal interests of his sisters and nieces in his estate and desires to treat them justly."
When the doctors made the examination, they knew nothing of the history of the case, did not know that Mr. Ney had been declared incompetent only a few days before, did not know that he had been confined in *Page 517 
a sanitarium for several months, and knew nothing of the symptoms displayed by him while there.
After the doctors had completed their examination and had left, the attorney, according to his testimony, read the will to the testator twice, word by word, carefully explaining its contents. The next day, the attorney paid the doctors one hundred dollars each for their services. He could not tell just how, or where, or from whom he had gotten the money, but felt quite sure that it must have been paid to him by Mr. Ney. It was not disclosed how Mr. Ney, confined in a sanitarium, with guardians in charge of his affairs, could have gotten the money to pay the attorney or the doctors.
After the will had been signed by Mr. Ney, the attorney delivered it to Mrs. McCormick, who at that time knew nothing of its contents but retained it until it was offered for probate. The appellant and the attorney testified that Mr. Ney was in his right mind at the time of signing the will.
By the will, the two nieces, Katherine Bodeau and Mary Diedesch, were each given one dollar. All the rest of the estate was devised and bequeathed to the two sisters, Marie Kramer McCormick, the appellant, and Katherine Bodeau, who is now deceased. After the transaction was completed, Mr. Ney returned to the sanitarium, where he remained until June, 1930. How he got back there is not disclosed. It was testified that none of the parties present on the occasion took him back.
We have given but a bare outline of the evidence concerning the execution of the later will. The details emphasize and accentuate the unusual and surprising character of the whole proceeding. Upon that character of evidence, however, it is sought to substantiate the will. *Page 518 
 [2] We are satisfied from the evidence before us that Mr. Ney was mentally incompetent to make the second will. Dr. Aldrich, the physician who had charge of him at the time, testified unqualifiedly that he was mentally incompetent. Another physician, testifying hypothetically, stated that, in his opinion, Mr. Ney was suffering from senile dementia, which he characterized as a progressive degenerative process occurring in the human brain; further, that, in his opinion, a person displaying the symptoms which Mr. Ney had displayed would not have sufficient mental power to deliberate or plan anything. Dr. Aldrich's testimony is supported by that of the nurse who cared for Mr. Ney just before he went to the sanitarium, and by an old and intimate acquaintance, who saw him frequently and talked with him often during the period of his affliction. We leave out of consideration, for present purposes, the testimony of the niece, although her testimony appears to be corroborated in practically every respect.
As to the evidence for the appellant, most of it was discredited, and what remained was not, under the circumstances, entitled to a great deal of weight. Concerning appellant's second attorney, the court stated that it was not at all satisfied with his testimony; that he had not made a full and complete disclosure of the facts; and that his testimony in numerous instances seemed incredible. A reading of the record gives us the same impression. As to the appellant's own testimony, the same may be said. The court characterized the part that she had in the matter as one of undue influence exerted upon the failing mind of an old man. In our opinion, it was not only an attempt to exercise an undue influence over a failing mind, but was an abortive attempt to wrest a will from one who was incompetent to make one at all. Undue influence was *Page 519 
combined with a form of duress to render the whole thing a product of fraud.
As to the doctors who certified to Mr. Ney's competency, we do not suggest any criticism of them. Both of them, by the record, were honorable and reputable men. Only one of them, however, testified at the trial, the other being dead at the time. It would appear from the record that they were deceived, rather than deceiving. It has already been stated that they were told nothing of the history of the case, nor of what was then a matter of recent and current event regarding Mr. Ney. The doctor testifying admitted that the old gentleman might have had psychological intervals. He further testified, "We could not, on our examination of him, make a diagnosis of senile dementia. We may have been wrong."
The examination by the doctors was made on two successive days. The first examination lasted about an hour; the second, about a half hour. All that the doctors knew about the case was what they concluded from their examination of the patient, without any extrinsic aid. The doctors knew nothing of the contents of the will. They certified that Mr. Ney understood the natural and legal interests of his sisters and nieces in his estate and "desires to treat them justly." And yet the will discloses that two of his sisters and the children of a third, each of whom had been given eleven per cent of the residuary estate in the former will, were not mentioned at all; further, that two nieces, one of whom had been given eleven per cent of the estate and the other twenty-three per cent, were each left one dollar. None of the other legatees or devisees in the former will, relatives and religious or benevolent institutions, were mentioned in the second will at all. What happened to change the old gentleman's mind? The answer, in our opinion, is that his mind *Page 520 
had become so affected as to render him incompetent to make the second will.
We are mindful of the rule that, to overcome a will, the evidence must be cogent and convincing. In re Johanson'sEstate, 178 Wn. 628, 35 P.2d 52. But we are satisfied from a careful reading of the record before us that Mr. Ney's incompetency at the time of making the second will was established by such evidence.
Upon this conclusion, we find it unnecessary to discuss the second ground upon which the trial court rested its decision, namely, that of undue influence. Mr. Ney being incompetent at the time to make a will, the purported will is invalid.
The judgment is affirmed.
HOLCOMB, BLAKE, and MITCHELL, JJ., concur. *Page 521