IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the ESTATE OF JOAN LANZNER, | No. 87038-6-I |
| DECEASED, | DIVISION ONE |
| RICHARD LANZNER and JONI PHILLIPS, | UNPUBLISHED OPINION |
| Petitioners, | |
| v. | |
| EDWARD LANZNER, as personal representative of the Estate of Joan Lanzner, | |
| Respondent. | |

COBURN, J. — Joan Lanzner's will could not be found upon her death in 2022. An authenticated copy of her lost will was admitted to probate. The will named Joan's[1] biological son, Mark Arellanes, and her stepsons Edward Lanzner and Robert Lanzner as beneficiaries. Ex. 100, at 1-2 (§§ 1.2, 2.1, 4.1). Joan's other stepson Richard Lanzner and biological daughter Joni Phillips later sought to invalidate the will based on the common law presumption that the lost will was revoked. Following a bench trial, the trial court found that Edward, as personal representative (PR) of the Estate, provided

---

[1] For clarity, we use first names when referencing several members of the Lanzner family who share the same last name.

evidence to overcome the presumption. Phillips and Richard challenge the court's order, arguing that the presumption was not overcome and that Joan died intestate. We affirm and award attorney fees and costs to Edward on appeal.

FACTS[2]

Joan married her late husband Irving Lanzner in 1978. Joan and Irving each had their own adult children when they married. They lived together in California before moving to Seattle in the 1980s.

In 2012 Joan and Irving executed identical wills. Joan's respective will named her biological son Arellanes[3] and stepsons Edward and Robert as beneficiaries should Irving not survive Joan. Ex. 100, at 1-2 (§§ 1.2, 2.1, 4.1). In the event Irving was unable to act as the estate's PR, the will named Edward as PR and Robert as Edward's successor. Id. at 2 (§ 4.1). The will did not provide for Joan's other stepson Richard and biological daughter Phillips. See id. Irving died in February 2016. Joan died in January 2022.[4]

Joan's will could not be located upon her death in 2022. A copy of the will was entered into probate in October 2022. In February 2023 Richard and Phillips brought an

---

[2] In their recitation of the facts in their opening brief, petitioners cite at times to pretrial declarations in the clerk's papers. The trial court's challenged order following a bench trial does not refer to such declarations. Instead, it states that the court "considered the testimony and arguments presented" and exhibits as the basis for its findings. Accordingly, this opinion only refers to the trial testimony, exhibits, and court's unchallenged findings.

[3] Arellanes has since died. The trial court found that the will did not provide for Arellanes' surviving daughter, which is not challenged on appeal. See ex. 100, at 2 (§ 3.1.2).

[4] Petitioners' opening brief refers to Joan's death as occurring in February 2022. Because they do not provide record cites or argument to challenge the trial court's finding that Joan died in January, we defer to the trial court's finding. See Mueller v. Wells, 185 Wn.2d 1, 9, 367 P.3d 580 (2016) (stating that unchallenged findings are verities on appeal).

action under the Trust and Estate Dispute Resolution Act[5] (TEDRA) seeking to invalidate the will.

Because the original will was authenticated but unavailable, the main issue at the three-day trial was whether Joan intended to revoke it. The court heard testimony from multiple family members, including Edward, Robert, the petitioners, and Joan's longtime friend Juanita Gardner.

Edward was 35 years old when his father and Joan were married. Edward described Joan as his "dad's wife" with whom he generally "had a very pleasant, cordial, positive relationship." He knew Joan as having "a very upbeat personality, very sociable, very interactive." Edward visited Irving and Joan regularly in the early 1980s when they all lived within 30 minutes of each other in California. Edward testified that they "did a lot of activities together," including holiday gatherings. When Joan and Irving lived in Seattle, Edward would visit them about five or six times a year when he was traveling for work. Edward spoke with Irving or Joan several times a week, depending on who answered the phone and who was available to talk. Edward testified that he and Joan were friends and interacted all the time.

Robert was around 22 years old when his father and Joan got married. He would visit them every one or two months when they lived near each other in California and took his family to visit them after they moved to Seattle. Robert had regular cordial phone conversations with Joan, including after she and Irving moved into a senior living facility in Bothell around 2015. Joan would update Robert on his father's health. Joan

---

[5] Ch. 11.96A RCW.

3

sent a letter to Robert in response to a sympathy card he sent after Irving died in 2016. Joan sent other letters to Robert's family, with "correspondence going back and forth."

Robert said he had a "relaxed" relationship with Joan and described her as "always pleasant," appreciative of the love that Robert had for his father, and that she was "always kind" to his daughters, who called her "Grandma Joan." Robert's daughter Sarah Lanzner testified that she had a relationship with Joan, who Sarah saw as her grandmother. Sarah had lots of photographs of herself wearing clothes knitted by Joan.

Edward testified that there was a change in Joan's upbeat demeanor in 2016 when the Bothell senior living facility moved Irving into memory care from the independent living apartment that he lived in with Joan. About a week before Irving passed away, Edward traveled from California to visit Irving and Joan at the facility in February 2016. Joan was upset with Edward because she believed he was involved in the facility's decision to separate her and Irving. Because of this, Joan had prohibited the facility from passing on communication from Edward, Robert, or Richard to Irving. Edward and Joan went out to lunch at a restaurant and Edward assured her that he was not involved in the facility's decision. Edward later inquired with the facility's chief executive officer (CEO) about the decision-making process in moving Irving from the apartment to memory care. Ex. 125. The CEO informed Edward that the decision was made in accordance with the facility's standard operating protocol.

Edward felt that his lunch conversation with Joan in February 2016 resolved the misunderstanding, and their relationship was again cordial. After their lunch conversation, Edward and Joan spent time talking with each other and being with Irving in his bedroom until Edward said his goodbyes and left to return to California. Though

4

the 2016 visit was the last time that Edward saw Joan in person, he later spoke with Joan by telephone to assist her with her tax returns and other financial matters.

Joan and her daughter Phillips were estranged. Joan only spoke to Phillips once in the 30 years prior to her death. Phillips testified that Joan had a drinking problem and was physically and verbally abusive. She described their mother-daughter relationship as "toxic" and that she "excused" herself from it. Richard described Joan as being "suspicious" and temperamental.

Joan was close and long-time friends with Juanita Gardner for more than 30 years. After Irving died in February 2016, Jaunita assisted Joan with moving into an apartment a few blocks from Gardner's house. Around fall 2016, Joan uncharacteristically walked from her apartment to Gardner's house, showed up on Gardner's deck unannounced, appeared "confused," and asked if she could move in. Gardner was concerned and called the non-emergency police line. After an evaluation by first responders, it was determined that Joan, who was diabetic, was "off of her insulin" and needed emergency gall bladder surgery. Gardner testified that after Joan received the surgery and was put back on insulin "[s]he was happier" and "not so agitated." Gardner explained that though Joan was not cognitively "capable of handling her life herself," her physical health improved after the hospitalization. "She slept better. She was more stable on her feet. That's the types of things I noticed."

At this time, Gardner became Joan's power of attorney (POA) for financial and health care decisions. Ex. 3. Joan initially preferred her biological son Arellanes to be POA, but she did not know where he lived or how to find him. As her POA, Gardner assisted Joan with all her health care appointments and was familiar with Joan's

5

medical conditions. Though she was not sure when Joan initially was diagnosed, Gardner testified that Joan had Alzheimer's disease and had trouble remembering people.

After Joan's emergency gall bladder surgery in fall 2016, Gardner helped her move from her apartment to an assisted living facility in Bellevue. Gardner described Joan's former apartment as "cluttered" with "food and garbage everywhere." Ex. 123. She helped Joan to gather every piece of paper that they could find, which did not include Joan's original will. Id. A box of electronics went missing during the move that included a laptop holding "most of the documents pertaining to Joan." Ex. 122.

Medical records from the assisted living facility dated October 2016 noted that Joan was observed as exhibiting cognitive issues, including memory loss, confusion, lack of orientation, and an "alteration in safety awareness due to cognitive decline." Ex. 128. The medical records also indicate that Joan was prescribed medication for "Alzheimer's dementia" but that the timing of the dementia onset was "unspecified." Id. Because Joan was not capable of handling her own affairs, Gardner remained her POA.

Around 2016 Gardner found a copy of Joan's will when she was going through Joan's apartment wherein the names of Joan's and Irving's children were crossed out in the "Identification of Family" section and the names of Edward, Robert, and Arellanes were crossed out in the provision that defines "children" for the purposes of the disposition of the estate. Ex. 1, at 1 (§§ 1.1, 1.2). Additionally, the names of Edward, Robert, and Arellanes were crossed out in section 3.1.1, which addressed the distribution of Joan's residuary estate in the event that any of the beneficiaries died before her. Id. at 2. At the end of section 3.1.1, "donate to Sight Connections" was

handwritten in. No initials appear next to the changes. Id. There appears to be no other changes, including no adjustments to the provision that named Edward personal representative of the estate upon Irving's death, and Robert as Edward's successor. Id. (§ 4.1).

Gardner testified that Joan told her that she struck out the names of Edward, Robert, and Arellanes on the copy of the will and that she wanted to donate her assets to Sight Connections, an organization that assisted Irving with his vision issues. Gardner, however, did not see Joan make the marks on the copy of the will and Joan did not tell her when the strikeouts were made. When Gardner asked Joan why she made the marks, Joan answered, "Well, can't you read? I wrote in where I want it to go." Gardner testified that Joan never created a new will, and that she did not think Joan ever tried to create a new will.

Gardner reached out to Joan's attorney Julie Fowler to inquire if Fowler had a clean, original copy of the will. Ex. 123. Though Fowler later emailed to Edward two copies of the original will after Joan's death, a marked-up copy of the will and an unmarked copy of the will, she insisted that Joan kept the original will document. Id.; Ex. 110. Gardner told Edward that she never found "an original will without markings" and that during the time that Joan ostensibly marked up a copy of the will, she had developed a new "habit of writing on everything." Ex. 123. Gardner described at trial a time that Joan wrote all over a knitting pattern even though knitters, like Joan, "just don't do that." Another time Gardner saw Joan write on a menu at a restaurant. Gardner found it "strange that what [Joan] didn't like, she just crossed out." Gardner described it as "[v]ery bizarre."

7

Gardner testified to other behaviors that Joan exhibited, including instances where Joan left cash in various residents' rooms at the assisted living facility and an incident where Joan purchased $1,200 worth of lamps, exceeding her credit card limit. Gardner said the lamps disappeared "within a few weeks." Joan's possessions were "[c]onstantly" disappearing. Gardner testified that during her time as Joan's POA, "stuff just came up missing. It was just part of Joan. I think she took things with her [to] places and left them." Gardner also described an incident between 2017 and 2020 when Joan poured Irving's ashes on the table and Gardner observed her playing with them.

Both Edward's and Robert's communications with Joan tapered off in these years prior to her death. Edward testified that his last conversation with Joan was in April 2016, when Edward talked to her about a Fidelity account and an assisted living facility invoice that Joan had sent him for tax purposes. The last contact Edward had with Joan was in December 2017 when she sent a letter to Edward with five cashier's checks, each for $2,000, and personalized notes for Richard's and Robert's children on behalf of Irving, which Edward forwarded to the grandchildren. Ex. 119. Gardner testified that she assisted Joan in 2017 with sending the checks and notes to Edward for her grandchildren, whom "she adored." The last time Robert spoke with Joan was in summer 2015, prior to Irving's death. The last time that Robert's family had contact with Joan was in 2018, when Robert's daughters sent a thank you letter to Joan for the $2,000 checks. Ex. 107.

When asked if there was a reason that Robert did not visit Joan again after his father died, Robert testified that he was occupied with his own family responsibilities. Robert said, "I feel for Joan, you know, I feel her situation, but I really kind of lost track."

8

Edward testified that he wanted to contact Joan after his last conversation in April 2016, but he was unable to locate her. Though Edward would previously receive updates from Joan's medical providers,[6] they would no longer provide him with information. Edward concluded he "must have been removed from [Joan's] contact list." Edward further testified, "[W]hen I got cut off by the doctor's office …, I concluded that [Joan] no longer wanted contact with me, until I received the letter in December [2017]."

In 2020 Gardner moved Joan from the assisted living facility into an adult family home. Gardner said the pandemic lockdown "was terrible" on Joan and caused her memory issues to become more severe. Gardner said, "[W]hen I moved her [into the adult family home], she knew me. Within a few months of moving there, she did not know me." About a year into the pandemic, Joan completely lost her ability to remember people and eventually lost her ability to speak.

Gardner did not search for Joan's original will upon Joan's death in 2022. Gardner said she did not look for it because she "had gone through everything …. [y]ears before" Joan died. As referenced above, Joan's attorney Fowler emailed as attachments two copies of the original will to Edward: the marked-up copy and the clean copy. Ex. 110; see exs. 1, 100. Gardner testified that she would have found Joan's will if it had been in Joan's possession in 2016, the year that Joan moved out of her apartment. Fowler said in her email to Edward, "I have no other information on Joan's estate. Joan retained the originals of her legal documents." Ex. 110. The marked-up copy of the will in the record has an "ORIGINAL" stamp on it. Ex. 1, at 1. It is unclear from the record how Fowler received the marked-up copy of the will. Gardner testified

---

[6] Edward also referred to providers as "county" and "service" providers.

she could not recall if she sent the marked-up copy of the will to Fowler but that she "might have."

In its oral ruling,[7] the court found that the testimony was generally non-conflicting and that each of the witnesses was "truthful to the best of their ability." In its written findings, the court found that Joan had "cordial and occasional" communication with Edward and Robert and a "a poisonous relationship" with her biological daughter Phillips. The court found that "[t]here was no evidence to exactly time the onset of Joan's Alzheimer's disease" and that the "exact sequence, timing, and severity of Alzheimer's symptoms can not be precisely tied to events in this case." But the court also found that there was evidence through medical records as well as some statements by witnesses that "the symptoms became more prominent sometime after 2018." The court found that although Joan's lawyer had a copy of the marked-up will, the lawyer did not meet with Joan in regard to the writing or any time after execution of the original will. The court found that Joan, after a certain point, had a habit of writing on everything, including restaurant menus, and "[t]his habit of writing roughly coincides with her medical symptoms." The court verbally observed that these circumstances made the marked-up copy of the will "at best[] equivocal evidence" of an intent to revoke her will. The court stated in its written order that Edward, as PR of the Estate,

> proved by clear, cogent, and convincing evidence that [Joan] did not intend to revoke her Will. Joan Lanzner's continued contact with her beneficiaries Robert Lanzner and Edward Lanzner, Joan Lanzner's mental decline, the failure to thoroughly search for the missing will, the existence of a copy with her lawyer, all are evidence of the same.

---

[7] We may consider a trial court's oral decision to interpret findings of fact and conclusions of law where there is no inconsistency. State v. Moon, 48 Wn. App. 647, 653, 739 P.2d 1157 (1987).

10

Accordingly, the court ruled that Joan did not die intestate. Petitioners appeal.

DISCUSSION

Standard of Review

Petitioners challenge the trial court's order upholding the admission of the copy of Joan's lost will. Petitioners argue that the trial court erred in finding that the Estate presented clear, cogent, and convincing evidence to rebut the presumption that Joan intended to revoke her will.

Petitioners incorrectly cite In re Estate of Bowers, 132 Wn. App. 334, 339, 131 P.3d 916 (2006), for the proposition that an appellate court reviews probate proceedings, which "are equitable in nature," de novo. The Bowers court did not review de novo because it was a probate proceeding, but rather because the trial court's findings were based only on a written record and not testimony.[8] Id.

In the instant case, the trial court took testimony over the course of a three-day bench trial. Our Supreme Court has held that "[w]hen reviewing a will contest, the appellate court's function is to determine whether the trial court's findings are supported by substantial evidence." Mueller v. Wells, 185 Wn.2d 1, 9, 367 P.3d 580 (2016) (citing In re Estate of Kleinlen, 59 Wn.2d 111, 113, 366 P.2d 186 (1961); Thorndike v. Hesperian Orchards, Inc., 54 Wn.2d 570, 575, 343 P.2d 183 (1959)).

---

[8] Respondent cites In re Estate of Ney, 183 Wash. 503, 505, 48 P.2d 924 (1935) for the same proposition. But Ney was decided prior to the merging of law and equity in 1951. Prior to this, appellate courts were statutorily required to review equity cases de novo. LAWS OF 1893, ch. 61, § 21. This statute was abrogated by the Supreme Court and subsequently repealed by the legislature. Thorndike v. Hesperian Orchards, Inc., 54 Wn.2d 570, 575, 343 P.2d 183 (1959) (discussing history); In re Estate of Kleinlein, 59 Wn.2d 111, 113, 366 P.2d 186 (1961) (collecting cases). Since January 2, 1951, the effective date of Rule on Appeal 43, 34A Wn.2d 47, as amended, there is no difference between an appellate court's "method of reviewing the record in equity cases and in law cases tried to the court." In re Estate of Mayer, 43 Wn.2d 258, 264, 260 P.2d 888 (1953); Kane v. Klos, 50 Wn.2d 778, 784, 314 P.2d 672 (1957).

"'Substantial evidence' is that 'quantum of evidence sufficient to persuade a rational fair-minded person the premise is true.'" In re Estate of Haviland, 162 Wn. App. 548, 561, 255 P.3d 854 (2011) (quoting Sunnyside Valley Irrig. Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.3d 369 (2003)). We defer to the trial court's weighing of evidence and credibility determinations. Mueller, 185 Wn.2d at 9 (citing Kleinlen, 59 Wn.2d at 113). We consider whether the evidence and any reasonable inferences most favorable to the prevailing party supports the trial court's challenged findings, even if the evidence is in conflict. In re Estate of Lint, 135 Wn.2d 518, 532, 957 P.2d 755 (1998); Scott's Excavating Vancouver, LLC v. Winlock Properties, LLC, 176 Wn. App. 335, 342, 308 P.3d 791 (2013).

We review the complete record for substantial evidence. Dixon v. Fiat-Roosevelt Motors, Inc., 8 Wn. App. 689, 695, 509 P.2d 86 (1973). "The party challenging a finding of fact bears the burden of showing that the record does not support it." Scott's Excavating Vancouver, LLC, 176 Wn. App. at 342. A trial court's unchallenged findings are verities on appeal. Mueller, 185 Wn.2d at 9. Where a court's findings are actually conclusions of law or mixed findings of fact and conclusions of law, we review the factual components under the substantial evidence standard and whether the factual findings support the trial court's conclusions of law de novo. Id.; Haviland, 162 Wn. App. at 561. We may affirm a trial court's decision on any basis supported by the record. In re J.N., 123 Wn. App. 564, 576, 95 P.3d 414 (2004) (citing LaMon v. Butler, 112 Wn.2d 193, 200-01, 770 P.2d 1027 (1989)).

<u>Admission of Will</u>

RCW 11.20.070 governs the proof of a lost or destroyed will, providing that:

12

> (1) If a will has been lost or destroyed <u>under circumstances such that the loss or destruction does not have the effect of revoking the will</u>, or is an electronic will, custody of which has not been maintained by a qualified custodian, the court may take proof of the execution and validity of the will and establish it, notice to all persons interested having been first given. The proof must be reduced to writing and signed by any witnesses who have testified as to the execution and validity, and must be filed with the clerk of the court.
> (2) The provisions of a lost or destroyed will, or an electronic will, custody of which has not been maintained by a qualified custodian, must be proved by clear, cogent, and convincing evidence, consisting at least in part of a witness to either its contents or the authenticity of a copy of the will.
> (3) When a lost or destroyed will, or an electronic will, custody of which has not been maintained by a qualified custodian, is established under subsections (1) and (2) of this section, its provisions must be distinctly stated in the judgment establishing it, and the judgment must be recorded as wills are required to be recorded. A personal representative may be appointed by the court in the same manner as is herein provided with reference to original wills presented to the court for probate.

(Emphasis added.)

Here, there is no controversy concerning compliance with the requirements of RCW 11.20.070(2) and .070(3). Joan's original 2012 will was authenticated and properly executed. The central dispute on appeal is whether clear, cogent, and convincing evidence supported the trial court's finding that Joan did not intend to revoke the lost will.

For purposes of the application of RCW 11.20.070(1), when a will is lost or destroyed, it is presumed that the testator intended to revoke it. <u>Bowers</u>, 132 Wn. App. at 342-43.[9] A party can overcome the presumption by showing "evidence of the 'testator's attitude of mind, as indicated by [the testator's] declarations made between the time of executing the will and the time of [the testator's] death.'" <u>Id.</u> at 343 (quoting

---

[9] RCW 11.20.070 has been amended since <u>Bowers</u> but the added language is not material to this discussion. <u>Compare</u> LAWS OF 1994, ch. 221, § 20 <u>with</u> LAWS OF 2021, ch. 140, § 1016.

In re Estate of Auritt, 175 Wash. 303, 308, 27 P.2d 713 (1933)). The evidence must be clear, cogent, and convincing.[10] Id. at 340, 343-45 (citing RCW 11.20.070(1)). Clear, cogent, and convincing evidence is evidence that makes the existence of a fact "highly probable." In re Welfare of Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973). The weight and not competency of such evidence "depend[s] upon the proximity in time of the testator's declarations and the other circumstances under which they are made." Auritt, 175 Wash. at 308-09 (emphasis added).

The Supreme Court in In re Estate of Auritt, found that the evidence was "abundant and ample" to support that the decedent

> bore a very strong affection for her brother William; that her attitude toward him never changed from the time that she made her will until the time of her death; and that she repeatedly affirmed, up to within a few days of the fatal tragedy, that she had made her will in her brother's favor.

Id. at 309 (emphasis added). Accordingly, the Supreme Court affirmed the trial court's finding that "Auritt never revoked her will, but that it was in existence, somewhere, at the time of her death." Id.

As Auritt demonstrates, evidence of a testator's unchanged intent toward a will's disposition may be direct, but it may also be circumstantial—supported by acts and circumstances that allow the reasonable inference that the testator had an unchanged attitude toward the purported beneficiaries at the time of the testator's death. Other jurisdictions have held the same. In re Estate of Scheide, 136 Nev. 715, 720-21, 478

---

[10] The Estate cites In re Estate of Auritt, 175 Wash. at 308-09, for its statement that a party can rebut the presumption of revocation stemming from a lost will by "clear, satisfactory, and convincing evidence." Auritt significantly pre-dates the relevant amendment to RCW 11.20.070, see LAWS OF 1995, ch. 221, § 20, which has been examined and interpreted to broadly apply the clear, cogent, and convincing burden of proof standard found in subsection (2) to subsection (1). Bowers, 132 Wn. App. at 341 (citing In re Estate of Black, 153 Wn.2d 152, 174, 102 P.3d 796 (2004)).

P.3d 851 (2020) (collecting cases); see also In re Estate of Strong, 194 Ill. App. 3d 219, 226, 550 N.E.2d 1201 (1990) (stating that "factors to be considered in addressing the rebuttal of the presumption include … evidence that [testator] entertained a kind and loving attitude toward the proposed beneficiary under the will up to the time of death").

We first address petitioners' specific challenge to the trial court's findings of fact. We agree with petitioners that substantial evidence does not support the trial court's findings that there was not a thorough search for the original will and that Gardner did not look in some boxes for the missing will.[11] Before Joan moved out of her apartment in 2016, Gardner helped her to gather every piece of paper they could find. Gardner did not search for the original will upon Joan's death because she had already gone through everything and did not find it. Gardner testified she would have found Joan's will if it had been in Joan's possession in 2016. The only evidence related to Gardner and boxes was regarding an email from Gardner to Edward stating that a box of electronics went missing when Gardner assisted Joan with her move to the Bellevue assisted living facility, which included a laptop that held "most of the documents pertaining to Joan." Ex. 122.

Regardless, these unsupported findings regarding the extent of the search for the original will are not material to the trial court's undisputed finding that the original will was lost. Our analysis remains the same. Even if these challenged findings were not supported by substantial evidence, substantial evidence does support the trial court's

---

[11] In its written findings, the trial court stated that Gardner "did not look in several remaining boxes." In its oral ruling, which petitioners specifically cite, the trial court stated that Gardner "searched when she first moved things out of the condo, [but] no one really searched through Joan Lanzner's belongings after her death. And oddly, there were apparently two boxes of records that were never opened. And it's not clear from the testimony in this case whatever happened to those two boxes of records."

other findings of fact, which support the court's conclusion that the Estate overcame the presumption that Joan intended to revoke her lost will.

The trial court heard testimony showing that Joan's favorable attitude toward Edward and Robert did not change prior to her death. Edward and Robert testified that their relationship with Joan was altogether friendly and positive. This included periodic visits they both made to see Joan and Irving, as well as pleasant and familial correspondence with Joan after Irving's death. Edward's and Robert's relationships with Joan were starkly contrasted in the record with Phillips' "toxic" relationship with Joan that Phillips chose to excuse herself from.

Robert testified to Joan's appreciation of him for his love for his father and the trial court heard repeated testimony about Joan's strong affection for Robert's two daughters, to whom she was affectionally known as "Grandma Joan."

Additionally, the record supports the trial court's finding that though there was a period that Edward lost contact with Joan because she blamed him for separating her and Irving at the Bothell senior living facility, their positive relationship was restored once Edward learned about the misunderstanding and informed Joan of the fact that he was not involved with the facility's decision to move Irving. The mending of their relationship, and Joan's favorable attitude toward Edward, was further evidenced by Joan reaching out to Edward after Irving's death to get his assistance with financial matters, including help with forwarding money to her grandchildren.

Because the record supports that Joan's overall relationship with Edward and Robert was positive, especially in consideration of evidence that Joan and her daughter Phillips had long been estranged, the trial court reasonably concluded it was highly

probable that Joan's testamentary intent at the time she executed her will remained unchanged.

Petitioners argue that the trial court improperly disregarded conflicting evidence that occurred after Edward's last in-person visit with Joan in 2016. Petitioners point to Gardner's testimony that around 2016 Joan crossed out all the named children on a copy of her will, wrote in "Sight Connections," and told Gardner that she wanted to donate her assets to the organization. Petitioners assert that the trial court's failure to account for this later purported act and Joan's apparent lack of contact with Edward and Robert during the last years of her life is fatal to the court's finding that the presumption of revocation was overcome. We disagree.

The record supports that the trial court considered this conflicting evidence in the context of Joan's coinciding cognitive impairment, which it was permitted to do. See Auritt, 175 Wash. at 308. The court found that though the exact onset and progression of Joan's Alzheimer's disease was not in the record, her habit of writing on everything roughly coincided with her medical symptoms. Viewed in a light most favorable to the Estate, see Lint, 135 Wn.2d at 532, the record reasonably supports that Joan was suffering from dementia during the period starting in 2016 that Gardner was acting as Joan's POA and Joan was living at the Bellevue assisted living facility. E.g., ex. 128. This is consistent with the period in which Gardner found and talked to Joan about the marked-up copy of the will, exhibit 1, and observed Joan's unusual writing behaviors. E.g., ex. 123. Gardner testified to other concerning behaviors that, in addition to the writing behaviors, could be reasonably inferred as medical symptoms related to Joan's Alzheimer's condition. The court heard testimony that Joan's condition worsened

17

leading up to her final move to the adult family home, where she further deteriorated prior to her death. The trial court's consideration of these circumstances goes to its weighing of the evidence, which we will not disturb. Auritt, 175 Wash. at 308; Sego, 82 Wn.2d at 739-40 ("As an appellate tribunal, we are not entitled to weigh either the evidence or the credibility of witnesses even though we may disagree with the trial court in either regard.").

We reject petitioners' assertion that the trial court was required to find that Joan lacked testamentary capacity to weigh evidence of her intent to revoke in the context of her cognitive status. Petitioners provide no authority to support this proposition. See Cook v. Brateng, 158 Wn. App. 777, 794, 262 P.3d 1228 (2010) ("Appellate courts need not consider arguments that are unsupported by pertinent authority, references to the record, or meaningful analysis."). The question before this court is not whether Joan executed a new will but whether the record supports the trial court's finding that Joan's attitude toward Edward and Robert remained unchanged to overcome the presumption that her will was revoked. See In re Estate of Eubank, 50 Wn. App. 611, 617, 749 P.2d 691 (1988) ("A will contest focuses on the issues of testamentary capacity, undue influence, or fraudulent misrepresentation as to the will's execution.") (emphasis added); In re Estate of Bottger, 14 Wn.2d 676, 685, 129 P.2d 518 (1942) ("[A] person is possessed of testamentary capacity if at the time he assumes to execute a will he has sufficient mind and memory to understand the transaction in which he is then engaged, to comprehend generally the nature and extent of the property which constitutes his estate and of which he is contemplating disposition, and to recollect the objects of his bounty.") (emphasis added). Here, in addition to weighing evidence in light of

surrounding circumstances, the trial court found that Joan did not meet with her attorney regarding the marked-up copy of the will or at any time after she executed her will in 2012. Petitioners do not dispute these findings and indeed concede in their reply brief that there is no indication in the record that Joan executed a "valid new will."[12]

We conclude that the trial court did not err in concluding that the Estate through clear, cogent, and convincing evidence overcame the presumption that Joan intended to revoke her lost will.

## Attorney Fees on Appeal

Edward asks us to award him attorney fees on appeal based on his successful defense of the TEDRA action in his capacity as PR. RAP 18.1(a) authorizes this court to award reasonable attorney fees and costs on appeal "[i]f applicable law grants to a party the right to recover" such attorney fees or costs. Edward cites RCW 11.96A.150, which authorizes this court to award reasonable attorney fees to any party in a TEDRA action in consideration of any factors that we deem relevant and appropriate. We may award attorney fees to be paid by any party to the proceedings. RCW 11.96A.150(1)(a). Because Edward prevailed on behalf of the Estate in defending the validity of the probated will and in consideration of the merits of the appeal, we exercise our discretion to award Edward reasonable attorney fees and costs on appeal to be assessed against the petitioners. The

---

[12] Petitioners state that "the potential existence of a copy [of the will] with another lawyer" does not show that Joan did not intend to revoke her will. (Emphasis added.) It is not clear whether petitioners are referring to the marked-up copy of the will or the unmarked copy of the will. Regardless, this is not an accurate characterization of the court's finding. The court found that "the existence of a copy [of Joan's will] with her lawyer" was evidence that she did not intend to revoke it. (Emphasis added.) The record supports that attorney Julie Fowler, who assisted Irving and Joan with the execution of their identical wills, had an unmarked copy of the will in her possession at the time of Joan's death. E.g., exs. 100, at 6; 102, at 6; 110.

amount should be determined by a commissioner of this court subject to Edward's timely compliance with RAP 18.1(d).

    Affirmed.

_Coburn, J._

WE CONCUR:

_Birk, J._

_Hazelrigg_